## BERNARDINO GONZALEZ V. THE STATE.

*No. 7217.   Decided March 20.   Motion for rehearing overruled June 27.*

1.   **Continuance—New Trial.**—Although a second application for a continuance may show due diligence to obtain absent testimony, yet if the absent testimony be supplied by other testimony adduced on the trial the refusal of the continuance will not be good ground for a new trial.

2.   **Evidence, Objection to.**—When a question is propounded to a witness which may elicit incompetent evidence the adverse party must promptly object to the question, and if, having the opportunity to object, he fail to do so before the question is answered, he can not complain that the answer of the witness is incompetent.   A party will not be permitted to speculate on the answer of a witness.

3.   **Evidence—Parol Testimony.**—A witness for the State in his direct examination referred to a charge made by the deceased against the defendant before a justice of the peace about some cows, and the district attorney thereupon asked the witness what was the charge.   Defendant objected to the question, because it was an attempt to prove by parol testimony the contents of a document required to be in writing, and because the contents of said charge was matter collateral to the issue.   The court overruled the objections, and the defendant then asked permission to cross-examine the witness, before he answered the question objected to, as to the extent of his knowledge of the contents of said charge, which permission the court refused.   Thereupon the witness answered said question in substance as follows:   "The charge made by deceased against defendant was asking him (defendant) how he got those cows that had Mr. Bruni's brand on them.   The cows spoken of were cows claimed by deceased.   When I said that defendant made a charge against deceased before the justice of the peace, I mean to say that is what I heard him say to the deceased in the presence of the justice of the peace."   The foregoing are the matters presented in the defendant's bill of exception number 4 referred to in the opinion, and held to not constitute error.

4.   **Exceptions to Charge.**—A general exception to the charge of the court will not be regarded.   In such case an error in the charge will not vitiate the conviction, unless the error be such as may have injured the defendant's rights.

5.   **Self-Defense—Charge of the Court.**—In giving in charge to the jury articles 570 and 572 of the Penal Code it is usual to give in charge article 570 first, but it is not error to first give in charge article 572.

6.   **Murder—Manslaughter—Justifiable Homicide.**—See the statement of the case and the opinion for a charge embracing the law of murder, manslaughter, and self-defense, held to be applicable to the evidence and to present the law fully and correctly upon every issue made by the evidence.

7.   **Argument of Counsel.** — See the opinion for remarks made to the jury by counsel for the prosecution in the closing argument, held to be harmless under the circumstances.

APPEAL from the District Court of Webb, on change of venue from Zapata.   Tried below before Hon. J. C. Russell.

This conviction is for murder in the first degree with the penalty assessed of confinement in the penitentiary for life. Alejandro Vidaurri was the name of the party murdered. There was a former conviction in the case, from which an appeal was prosecuted, and the judgment of conviction was reversed and the cause remanded for a new trial. 28 Texas Court of Appeals, 130.

The evidence adduced on the trial as shown by the statement of facts in the record is as follows:

Luciano Salinas, a witness for the State, testified as follows: I live here in Laredo, at Sam Anderson's. I knew Alejandro Vidaurri at his ranch. I know the defendant Bernardino Gonzalez. [Here witness points out defendant.] Alejandro Vidaurri is dead. He died about two hundred steps from his ranch. He died from a shot. He was shot with a pistol. Bernardino Gonzalez, the man now on trial, shot him. I saw the shooting. The shooting took place as near as I can remember about eleven months ago, on the other side of the Lajas Ranch from Laredo. Alejandro, Don Andres Garza, Evaristo Rodriguez, Pancho Guzman, Bernardino Gonzalez, Mr. Grimes, the customs inspector, and myself were present at the time of the shooting, which occurred about 2 or 3 p. m. I had gone from the Palo Blanco Ranch in Encinal County to deceased's ranch in company with my uncle, Francis Villareal, who was taking some horses and cows there to sell to deceased. We arrived there in the afternoon of the second day preceding the killing. We remained there that night, and the next day my uncle went to the other side. On the day after our arrival deceased branded the stock. The next day, which was the day of the shooting, I left deceased's ranch in company of my grandfather, who had also gone with us with the stock for Laredo. My grandfather's name is Chan Villareal. We had got as far as the Lajas Ranch when we were overtaken and stopped by Andres Garza, the defendant, and Mr. Morel, and one Pancho Guzman. Mr. Morel searched my grandfather and took from him his carbine and knife and started us back to Las Lajas. From the Lajas Andres and defendant took me back to the place where the stock was, I riding behind Don Andres. Defendant was armed with a pistol and carbine. The place where the stock was was near the road and close to the ranch of deceased, say about 350 yards. When we reached the place where the stock was Mr. Grimes and Evaristo Rodriguez were with the stock and had it in charge. On arrival I got down and sat under a small mesquite. After a little while deceased came up on horseback and saluted those present and asked Mr. Grimes' permission to take the stock. Grimes told Andres to tell deceased to wait until Morel came. Deceased said all right, and remained standing. Then defendant came up in front of deceased and said to him, "Why are you branding those calves?" and deceased replied, "Because they belong to me." Defendant replied that they did

not belong to deceased. Deceased then said, "That is all right; we will settle that matter at law." Defendant then said, "There is no law nor anything," and then drew out his pistol and shot deceased. At the time defendant pointed his pistol deceased was sitting on his horse with his left hand resting on the horn of his saddle and his right hand holding the reins resting on top of his left. When defendant pulled his pistol the deceased with his right hand reined his horse to one side away from defendant, and at the shot fell backward off his horse. Deceased did not have anything in his hands when he fell. He was unarmed. When defendant pulled his pistol he (defendant) stuck spurs to his horse and jumped him toward the deceased, and at this moment Mr. Grimes made a motion as if to stop defendant and said, "Stop! don't shoot him." At the time of the shooting all were on horseback save myself. One shot only was fired. Deceased did not fire. Defendant after the shooting walked with his pistol in his hand around the body of deceased. Mr. Grimes then said to Andres, "Tell him to put his pistol in his scabbard." Defendant put up his pistol and then started off, and the others followed a short distance. Defendant remarked, "I am going to deceased's house to see who else is there." Grimes then said, "Tell him not to go." Deceased did not move after he was shot. After deceased fell his horse ran off. A short time after the shooting Morel and Porfirio came up, and then they all went off. I am 14 years of age. I am not related to the defendant nor the deceased, nor to any of the witnesses in this case, and have no interest in the matter. The mares that were held by Grimes at the place of the shooting were the same mares that were taken to be sold to deceased by my uncle.

On cross-examination witness stated: I live here in Laredo with Sam Anderson. Do not work for him. Do not know relationship exists between him and deceased. Do not know who pays my board. Live with him and his family. The wife of deceased lives at the same house. My real home is on the other side of the river. Had been absent from my home about seven months when deceased was killed. During this time had lived part of the time with my uncle at the Atascosa. I went with my uncle Francito to deceased's with some mares and cattle. We drove them from the Palo Blanco. Do not know how far it is from the Palo Blanco to the ranch of deceased. Were on the road some days and nights, but can't say how many. We arrived at Vidaurri's in the day-time, but can't fix the hour. It was in the afternoon. My uncle and grandfather were with me. Do not remember number of stock we had. The stock was in the brand of my uncle, but I can't now make it. Do not know the points of the compass. The night of the day we arrived at deceased's we all spent the night there and the next day my uncle Francito went to the other side, and myself and my grandfather remained there all that day. Did not ar-

rive there in the night-time. The night we arrived we staid all night, and deceased and Salvador Cuellar also staid there. There were no others present. Think the stock had already been sold to deceased when we got there, and that we were only taking it to deliver it, but can't say when it was sold. Grandfather and myself remained at deceased's all next day and night. On the second night there were present deceased, myself, grandfather, and Salvador Cuellar. The stock were branded on the day after we got there in the afternoon. Was present when stock was branded. Salvador, deceased, grandfather, and myself branded the stock. Do not remember how many were branded. The day after the stock were branded the deceased was killed. The day after the branding my grandfather and myself started for Laredo. Do not know where we intended to go after that. We had arrived a little on this side of the Lajas Ranch, at the corner of the field, when we were overtaken by Garza and defendant. This was some distance from Vidaurri's ranch. Grandfather and myself left alone, and were alone when overtaken. We were traveling on the same horse. I went back to the place of the killing behind Garza on his horse. From the place where we were overtaken we all (Garza, Morel, Porfirio, and grandfather and myself) went back to the Lajas together, and from there Andres put me on his horse and took me back to the place where Vidaurri was killed, defendant going along with us, leaving Morel, Porfirio, and my grandfather at the Lajas. I ate dinner at the Lajas the day of and before the killing. When we got to the place where horses were we found there with the stock Mr. Grimes, Evaristo Rodriguez, and Pancho Guzman. Do not know Justo Cruz. Saw Pancho Guzman there when I got back. He was herding the stock a short distance from Grimes. There were no bushes between me and him. The sun was shining and it was a warm day. Up to the time I got down defendant had not arrived. The defendant arrived a short time afterward. When I got down I went and sat down under a small mesquite tree and was taking off my boot, because it hurt my foot. The tree had leaves on it, and made a shade. I saw Vidaurri when he came up. He came from the direction of a thicket. The thicket was about 125 yards from where we were. Vidaurri was riding a dun horse, and had on a small white hat but no coat. Do not remember about his shirt. He had on a shirt and vest. Did not see anything around Vidaurri's body. Did not see the cartridge belt. Did not go up to the body. Did not approach any nearer than I was when it fell. Was about twenty feet from deceased when he fell. Garza was a little nearer than I. Rodriguez was also nearer. Deceased did not have a Winchester on his saddle. I know that Vidaurri was not armed because I saw him. I saw both sides of Vidaurri's horse and saddle. I never saw the horse again after it ran off. Did not go off with any one, but after a while my grandfather came, and

then the two officers took me, my grandfather, the defendant, and Evaristo to Carrizo. Salvador Cuellar came to the place where the killing took place before I left, but up to this time did not see deceased's horse brought back. [This being Saturday afternoon, witness was allowed to retire until Monday morning under the rule, and on Monday morning, defendant continuing his cross-examination, witness stated as follows]: Vidaurri was not armed when he was killed. Don't know where his pistol was. Do not know that he had a Winchester. Did not see him have either pistol or Winchester when I was with him at his house. Did not see the brother of deceased the morning I left deceased's ranch for Laredo. Salvador Cuellar and Vidaurri were at the house the morning we left for Laredo. No one else was there at that time. No one came into breakfast there that morning. Since Saturday I have been at the house of Don Dario Sanchez and Don Samuel. Have been with Don Dario to-day, but not with Salvador Cuellar either in court or out of it. Have been sitting with Sam Anderson here in the court house, but have not spoken a word to him. [Here witness was instructed by counsel for the defendant to repeat all that occurred on the ground at the time of the killing and after he got there, when witness stated as follows]: I got down from Don Andres' horse and went and sat down under a small mesquite tree and was taking off my boot, which hurt my foot, and after a short interval Vidaurri came up and spoke to Mr. Grimes and said, "With your permission I will drive my stock off," and then the inspector said to Don Andres, "Tell him to wait a little while until Mr. Morel comes." Then Vidaurri said, "All right," and moved a piece and stood there. Then the defendant came in front of Vadaurri and said, "Why have you been branding these calves?" and Vidaurri answered, "Because they are mine." Then defendant said, "They are not." Then Vidaurri said, "All right, we will settle that at law." Then defendant replied, "There is no law nor anything," and drew his pistol and shot deceased. I do not remember hearing or seeing anthing more. I do not now remember the time of the day it happened. I may have said formerly that it was 2 or 3 o'clock in the afternoon, but I do not now remember what time it was. I remember having testified in a former trial of this case, but I do not remember having then testified that this thing happened at 10 a. m., nor do I remember having then said that the killing took place on the day after our arrival at deceased's ranch. It did not take place on that day, but on the day following. Nor do I remember saying in a former trial that the killing took place about fifty yards from deceased's house. The day of the killing was the first time I had ever seen the defendant. I never told the district attorney that I had known him before that day. I met defendant for the first time the day of and before the killing, at the Lajas Ranch, but did not talk with him and was not introduced to him. At the Lajas and before the kill-

ing I heard parties present calling him "Chino," but did not then know his proper name. The first time I ever saw Andres Garza was the day of the killing. Had never seen Mr. Morel, Mr. Grimes, Pancho Guzman, or Evaristo Rodriguez before that day. I know these men by their names, because I heard people calling them by their names at the place where the mares were and at the Lajas Ranch. I saw at the Lajas Ranch the following persons: Don Andres, Mr. Morel, Porfirio, and the defendant Bernardino Gonzalez. I saw Pancho Guzman at the place where the mares were, and learned his name by hearing it mentioned there. I have talked about this matter at the house of Sam Anderson with the family, to-wit, Mrs. Anderson, Mrs. Vidaurri, and Mrs. George Anderson. I do not remember how many days I have been at Anderson's house this time, but think about twelve. Yes, I have talked this matter over with the Anderson family. No one asked me any questions. When I spoke of the matter the family were all present. They asked me no questions. They also talked the matter over among themselves, and when I heard what was said I understood them.

A. C. Grimes, a witness for the State, testified as follows: My name is A. C. Grimes. On the 17th day of February, A. D. 1889, I was in the pasture of A. M. Bruni, in Zapata County, and met Alejandro Vidaurri there that day. I had never seen Vidaurri before that time. Vidaurri is now dead. He was killed there that day by the "Chino." The "Chino" is the defendant now on trial. Defendant killed him with a pistol. I know defendant killed him, because I saw him killed, or at least saw the shot fired. Defendant and deceased had some dispute, but as they were talking in Spanish, which I did not understand, I can't say why defendant killed deceased. There were words between them, but as I did not understand them I can't say what caused the shooting.

On cross-examination witness stated as follows: On the day before the killing myself and Morel, being custom house inspectors, were on a scout up the river, and on this scout met a Mexican who informed us that a lot of stock had been driven in to be turned over to Vidaurri the day before. We then went to A. Bruni's ranch and staid there that night. While there Morel called Andres Garza and told him what he had heard about this stock, and that he wanted him and his hands to go with us the next morning and assist us in rounding up the pasture. The next morning we, Evaristo Rodriguez, Pancho Guzman, Andres Garza, Morel, and myself and the defendant started out to see about the stock. We rounded up one bunch, about eighteen head of horses and mares. After we had caught this bunch Mr. Morel struck out leaving me in charge. After he had gone some of the party with me found ten more head, freshly branded, and turned them into the bunch. In about two hours after Morel had left Andres and the

defendant returned bringing with them a boy behind Andres on his horse. When they rode up I asked after Morel, and Garza replied that he would be along after a while; that he (Morel) had the old man with him. There was another man with Morel. While we were there awaiting Morel our positions were as follows: Andres was on my left, and Evaristo was also on my left but further off than Andres, while the defendant was on my right. While standing there talking Vidaurri rode up on my left and spoke a few words. I then asked him to whom the stock belonged. He claimed not to speak English, and I then told Andres to interpret for me and to ask Vidaurri if he had any papers for this stock. This conversation was carried on in Spanish and Garza acted as interpreter. Vidaurri replied to my question about the papers that he did not have the papers for the stock, but that the old man had gone to Laredo after them. Then Vidaurri started to ride off as if he was going to drive the stock off, and I then told Andres to tell him to stop and wait until Morel come. After this I sat there and said no more, as I had said all that was necessary, when the defendant spoke to Vidaurri. The first word spoken after I had finished speaking was by defendant to deceased. This was in Spanish, and as I do not understand the language I can not say what was said. Then Vidaurri answered the defendant in Spanish, and then the defendant replied again and Vidaurri again answered the defendant. When Vidaurri last spoke to defendant I saw that he was getting mad from the expression of his face and the way in which he spoke. When I saw that Vidaurri was getting mad I turned to the defendant, who was on my right, and just as I turned I saw him (the defendant) draw his pistol. I then jumped toward defendant and said, "Hold up! do not do that," and about the time I got the words out of my mouth the shot was fired. I then turned and saw Vidaurri fall from his horse. I then rode up intending to get down and turn him over, but saw that he was dead and did not do so. At the time the shot was fired I was looking at the defendant, as my attention had been attracted to him. The first thing that the defendant did after Vidaurri was killed was to roll a cigarette. Before he rolled the cigarette he put up his pistol. Did not see the defendant ride around the body with a pistol in his hand. Was there and do not think that he did. Defendant remained there until Morel got back and then we took him to Carrizo. It may have been fifteen minutes or half an hour after the shooting when Morel arrived. We all remained near the body until Morel's arrival except Evaristo, whom I had sent off after the horse of deceased. I was about thirty feet from Vidaurri when he was shot. Defendant was on my right and about twenty feet from me at the time, and defendant was about twenty feet from deceased. Andres was on my left and a few feet from me and closer to the deceased than I. Evaristo was further to the left and nearly straight behind the deceased. Vi-

daurri was sitting on his horse and the horse's right side was to me. Pancho Guzman was off about one hundred yards with the stock and was not present at the killing. There was some brush between me and the stock, but it was a tolerably open country. When I first saw the boy after the shooting he was off some thirty or forty steps and appeared to be frightened. He was then standing up looking toward where we were. I know that the horse of the deceased turned its left side to me as it ran off, but I did not notice it. I saw the horse again that day. In a few moments after the shooting the horse was brought back by Salvador Cuellar and Basilio Vidaurri. Was still there when the horse was brought back. Was pretty close to the horse when it was brought back. It was a dun horse with a white face. Did not notice anything on the saddle when it came back. Did not see a carbine scabbard if there was one on it. It was about twenty or twenty-five minutes after the shooting when the horse was brought back. Did not hear anything then said about deceased's carbine. They were talking in Spanish, and Mr. Morel rode up about that time and he may know. It was probably about six hundred or seven hundred yards from deceased's house to the place of killing. This was about three or four miles from the ranch of A. Bruni. It is true we pursued the stock from information received that it was crooked stock—that is, that it was smuggled stock—and because we had learned that seven armed men had brought the stock into the pasture. The stock was in my charge after they were rounded up. Evaristo Rodriguez and Pancho Guzman were with me holding the stock after the same had been rounded up. At the moment the shot was fired I did not see the deceased, as my attention had been drawn to the defendant at that moment. I did not notice the left side of deceased's horse. I seized three head of stock and they were turned over to the government, and the balance were released. These three head were found in the stock claimed by Vidaurri.

On redirect examination witness testified: At the time the affair occurred I was a custom house inspector and prior thereto had been a State Ranger. I did not see any arms on Vidaurri. Did not see any arms on his saddle. If he had any on his person or saddle I did not see them. At the time the shot was fired I was looking at the defendant. I turned to the defendant to stop the racket, as I did not want any row. But when I turned it was already too late, as he had his pistol out. When I rode up to the body after it fell I did not see any arms on it. I saw a cartridge belt, and supposed if there was a pistol attached it was under the body. Defendant and deceased were on horseback at the time and facing one another. I could not see them both at the same time, but the way of it was this: When I saw that they were getting mad and when Vidaurri spoke last to the defendant I turned to the defendant to stop the row, but when I turned he was already

drawing his pistol.   When I took my eyes off the deceased to look at the defendant he (the deceased) was sitting with his hands on the horn of his saddle—that is, with his left hand resting on the horn of the saddle and the right holding the reins resting upon the left.   The time that elapsed from the time I took my eyes from the deceased to look at the defendant, the instant the shot was fired, was just as much as one would consume in turning one's head from one side to the other.   Up to the time I turned my attention from deceased to the defendant, at the moment of the shooting, I had not seen deceased make any attempt to draw any arms or to attack the defendant.   I saw that there was a dispute between them and that they were quarreling, but as they were speaking in Spanish I can not say what it was.   The diagram I have made for the counsel for the defendant of the positions of the parties present at the time of the shooting is correct as near as I can now remember, but I am not positive as to the distances the parties all were one from the other, and in this respect I am only guessing at it.   The witness Luciano Salinas now presented to me was present at the time, and is the boy to whom I refer.   He is the boy who came up behind Garza on his horse.   When I first saw the boy after the shooting he was standing up looking in our direction and could see all of us from where he stood, as it was on an open space.   After shooting defendant put up his pistol and in a moment after he rolled a cigarette and then started off, and I told Andres to tell him to stay right there with me and that he could not leave.   When Morel arrived I told him a man had been killed and who had done it, and we then arrested the defendant and carried him to Carrizo.   When we left with the defendant for Carrizo, Garza remained with the body with instructions to let no one molest it until the coroner arrived.   Vidaurri offered no resistance to our holding the stock and did not kick up any row.   He spoke pleasantly, and when I asked him to come back as he started off toward the stock he came back and stood there, saying nothing until spoken to by defendant.   Vidaurri was in his shirt sleeves and I think had on a vest, but am not certain as to the vest.   I can not say who commenced the quarrel, as they spoke in Spanish, but the defendant here is the one who spoke first as between him and deceased.   I did not ask the defendant to address the deceased about any matter.   I was the person in charge of the stock.   Defendant was armed with a pistol and a Winchester rifle.   We were all armed, acting together in holding the stock. Do not know in what part of the body deceased was shot, but saw blood coming out of his mouth and on the side of his neck.

On recross-examination witness stated:   The instant I turned my eye from deceased to defendant I saw defendant drawing his pistol, and as I then turned to look at Vidaurri I saw him falling backward off his horse.   The only motion I saw Vidaurri make was when he last replied to defendant and at the instant before I took my eyes from him,

and that was to "sorter" rein his horse up facing defendant and to put his hands on the horn of his saddle, and this was when I saw he was mad. It was about half an hour after Garza returned with the boy that the deceased rode up, and the shooting occurred in a short time thereafter. The first time I noticed deceased he had ridden up pretty close to us. After I had finished speaking the defendant then addressed the deceased, and then in a very few moments the shooting took place. As soon as the shooting was over I rode up to the head of deceased and saw that he was dead, and it was then that I looked behind me and saw the boy in the locality and position before stated. The cigarette business was after this, and after defendant had put up his pistol. Defendant did not want to go off, but he started off and I told Andres to tell him not to go.

Mrs. Maria Vidaurri, a witness for the State, testified as follows: I knew Alejandro Vidaurri. He was my husband. He is dead. He died on the 17th day of February, 1889, in Zapata County, Texas, at his ranch. I know the defendant, Bernardino Gonzalez. Have known him about two years. I overheard a conversation between the defendant and deceased about the latter part of December, 1887, or the first part of January, 1888, I am not certain which month. This conversation took place at our house here in Laredo. The defendant came to our house and stated to my husband that he was broke, and that the feasts were about over, and that he had to get money some way, and that he had the means to get the money, and then asked my husband, "Why do you not assist me as a tool by making me a paper inviting me to buy mules across the river? Antonio Bruni has offered me money to kill you." My husband told him that he did not have the means to go into partnership with him, and the defendant replied: "I do not want you to go into partnership. All I want is to show Bruni that I am going into partnership with you, and then I can get all the money I want out of Bruni, as he (Bruni) wants me to kill you; and I can also get a dark horse out of him, which I want. But you need not have any fear of me, as I am as good a friend as you have in the world." After this defendant spoke of the matter again, and this time it was at our ranch and occurred in this wise: The defendant came to the ranch, my mother and myself being there alone, and said to my mother (they were speaking about a child that Bruni had theretofore recently lost), that Bruni's other boy, who had also been sick, was all right now, and that he (Bruni) wants me to stay at the ranch and take care of the children, but that it was not so much on account of the children that he wants me to stay as it was that he (Bruni) was always telling me that he would pay me to kill Alejandro Vidaurri.

On cross-examination witness stated: The first conversation between my husband and defendant took place here in Laredo about the time stated, and the second conversation took place at the ranch between

defendant and my mother about the month of March or February, A. D. 1888.    At the first conversation there were present the defendant, myself, and my husband, Alejandro Vidaurri.    I was in the room and heard all that they had to say.    They were then friendly, and the defendant would come to my house to visit my husband.    The first conversation occurred in the day-time, about 10 or 11 o'clock a. m.    After the conversation defendant remained some time, but did not take dinner with us.    The second conversation occurred at the ranch a few days after we had gone out there.    We were accustomed to make occasional visits to the ranch, and it was on our second visit there after the first conversation that the defendant stated to my mother what I have here detailed.    The defendant ate and slept at the ranch that night and went off next morning and never came back any more.    Never saw defendant and my husband come to the ranch together.    As before stated, the second conversation occurred at the ranch between my mother and the defendant and in my presence.    During the conversation, and while they were speaking of a child that Bruni had lost and one that was better, the defendant told my mother that the other child of Bruni's which had been sick was better now, but that he (Bruni) still wanted him (the defendant) to remain and look after the child, but that it was not so much on account of the child as it was that he (Bruni) was always offering him (defendant) money to kill Alejandro Vidaurri.    Defendant did not tell me he was going to kill my husband.    After this conversation I never saw the defendant again until I saw him in court.    I told my husband what defendant had said and that it would be best not to let defendant come to the house, and that I did not like to have him come to the house after what he had said.    My husband replied that he was not afraid; that he and defendant were good friends.    My husband had a Winchester rifle, but did not own nor carry a pistol.    After this last conversation I remained at the ranch about a month and then returned to town accompanied by my husband, who then returned to the ranch.    My husband's business was at his ranch in Bruni's pasture, and he would visit me about every eight days.    Bernardino (the defendant) was working for Bruni at the time of the killing, but I do not know whether he was working for Bruni all during 1888 or not.    But he did work a part of 1888 for Bruni.

Alejos Torres, a witness for the State, testified as follows:    My name is Alejos Torres.    I live in San Ygnacio, Zapata County, and am the constable of that precinct.    I knew Alejandro Vidaurri in his lifetime. He is now dead.    He died some time last year, right near his ranch in Zapata County.    I was sent by the judge to take care of his body, and found it lying near his ranch, near a road, and also found Don Andres Garza in charge.    The place where I found the body was in Zapata County and in Bruni's pasture.    They held a coroner's inquest over

the remains while I was present. The body was examined and I assisted in the examination. There was only one wound on the body—a gunshot wound. The ball entered on the right side of the neck about two inches below and to the rear of the right ear and came out at the base of the left ear. There were no arms on the body—only found a cartridge belt filled with cartridges. The belt had no pistol holster attached. The body was in shirt sleeves and vest and without a coat. Had known deceased from the time he was a boy. I knew of a difficulty between defendant and deceased that occurred prior to the killing about a month or less. This was about some cows deceased had in his field that defendant claimed belonged to Bruni. Vidaurri went before the justice of the peace and made a charge against the defendant. [Here witness was asked to state what the charge was, if he knew. Defendant objected, because it calls for the contents of a document which is required by law to be in writing, to prove which parol evidence is not admissible, which objection was overruled by the court and defendant excepted. Then the defendant requested to be allowed to test said witness as to his means of knowledge, which request was refused by the court and defendant again excepted, and then witness was told to state what said charge was, if he knew, and replied as follows:] Vidaurri made a charge against the defendant demanding of him how it was that he had some cows in his (defendant's) possession belonging to him (Alejandro Vidaurri) with the brand of A. Bruni upon them, to which defendant replied that these cows had been sold to A. Bruni by D. Trinidad and Juan Vidaurri. The justice then gave me orders to go and get these animals. At the time deceased made this demand there was a dispute between him and the defendant about these and other animals. The deceased claimed the stock as his, and the defendant replied that he had taken the cows from the Corralitos because they had been sold to Bruni. Vidaurri then told the defendant that he would not ratify the sale, and that he would like to know who put Bruni's brand on them, and that he (defendant) nor any one else had any right to brand his stock. After this defendant made a claim on Vidaurri about three beeves which he (defendant) claimed belonged to Bruni and had been delivered to Vidaurri by one Landin. Then deceased told the defendant if such was the fact to prove it. Then the judge gave me an order to go and get the three beeves from Vidaurri's field. Bernardino (the defendant), Pancho Guzman, Evaristo Rodriguez, and Andres Garza, who were all working for A. Bruni, went along with me after the stock. This is the only dispute or difficulty that I know of as having taken place between the defendant and the deceased prior to the killing.

On cross-examination witness stated as follows: I am constable of Zapata County, and when I went after the three beeves I went as an officer. I did not ask any assistance, but the parties claiming the

beeves went with me, to-wit, Andres Garza, Evaristo Rodriguez, Pancho Guzman, and the defendant. When we reached the field deceased was already there. As soon as we got there the defendant told me to turn all the cows out of the pen. Then deceased said, "You will first have to pass over my body before you turn those cows out of the pen." I then said to deceased that I had no orders to turn the cows out, and that I would not do so. I then sent Andres Garza after an order from the justice of the peace to turn the cows out of the pen, and the next day I returned with the same parties and an order from the judge to turn the stock out of the pen. I presented the order to the deceased, and he said there was something lacking in the order to make it legal. I then told him that it was too far to return to amend the order, and that if there was too much in the order to make it away, and that if there was not enough in the order to add what he pleased. Then deceased asked me if I would be responsible to him for the stock, and I replied yes, and at the same time told him that if he was not satisfied he could sue me or Don Andres or the judge. Deceased then said that Bernardino (the defendant) should have come by himself and not in company with others, and that whenever he met the defendant alone he (the deceased) would f—k him and his mother. This was said in defendant's hearing. You can take this remark to mean anything you please. In ordinary use it means to take arms and kill another. After this conversation I sent the herders of A. Bruni, to-wit, Andres Garza, Evaristo Rodriguez, Pancho Guzman, and the defendant, to drive the stock out of the pen. Bernardino (the defendant) started with the others after the stock, but I called him back and told him not to go, as I did not want to see any trouble. At this time deceased did not try to get any arms. I told the deceased that I was not a fighting man, and that I did not want to see any trouble,. and that it was no use to have any trouble over this matter, but that if there was any question about the matter to settle it peaceably. I did not read the charge made by Vidaurri. The judge was repeating it there in the presence of all. I can not read English. They were speaking in the Spanish language. I was simply hearing what all were saying. The defendant was there representing A. Bruni.

On redirect examination witness stated: When I say that the deceased made a charge against the defendant, and the defendant made a counter-charge against the deceased before the justice of the peace, I mean to say that that is what I heard each of them say—the one to the other—in the presence of the justice of the peace, and what I have here repeated as to a charge being made by the one against the other, is simply what I heard them saying there in the presence of the justice.

Here the State rested its case, whereupon the defendant introduced the stenographic report of the testimony of the witness Andres Garza as given and reduced to writing on a former trial of this case, the same

being the testimony sought to be obtained by defendant's application for a continuance upon the call of this case for trial in the present instance, and which is as follows:

My name is Andres Garza. I live with my family, and am in the employ of Antonio Bruni. I am the major domo of his ranch in Zapata County. I know defendant. He was in the employ of Antonio Bruni in February, 1889. I know both Grimes and Morel, and remember well the circumstances of the killing of Alejandro Vidaurri. I was present at the killing, which took place on the 17th day of February, A. D. 1889, in Zapata County. Those present at the time were myself, Evaristo Rodriguez, Grimes, defendant, Pancho Guzman, and the little boy. The little boy was brought back there by me, and at the time of the shooting was about thirty or forty steps in the brush from where the killing took place. [Here witness was requested to make a diagram showing the relative positions of all those present at the time of the shooting and to explain same to the jury, and thereupon witness made a diagram of the scene and explained the same to the jury.] Continuing, he said: I was about twenty-five feet from the deceased and about the same distance from defendant, and the defendant was about the same distance from Vidaurri. There were some small bushes where we were, but not enough to obstruct the vision. There were also some bushes between the place where we were and the horses. About 6 p. m. on the evening before the killing Mr. Grimes came up to where I was at work and asked me if I knew anything about some stock having been driven by seven armed men. I replied that that was the first that I had heard about the stock. He then told me, "In the name of the United States, I command you to go along with me and some of your men, and look after this stock." I then asked him when, and he said, "to-morrow morning we will start." The next morning he again spoke to me, and we started and went to the place where the occurrence took place. When Mr. Grimes told me to take some of my men along with me I commanded those who were present at the killing to go along. They knew what we were going to do, as I told them that Morel had asked for help and that they should go with him. We found twenty-seven horses and mares all told in Bruni's pasture. I was in charge of Bruni's pasture and had never given the deceased any permission to put this stock in the pasture. I do not know when this stock had been put in the pasture. I had known the deceased for quite a long time. I had known the defendant for a shorter time than I had the deceased. When we all first arrived at the place where the stock were Vidaurri was not yet there. He came up afterward from toward the north on a gallop. In the direction from which Vidaurri came there was some clear country and some very thick brush, and he came from the very thickest part of the brush. [Here witness was told by defendant's counsel to relate all that occurred from the arrival of Vidaurri

until the shooting took place, whereupon witness stated as follows:] Vidaurri rode up on a gallop from the thickest part of the brush and approached to within twenty-five feet of Mr. Grimes, when Grimes spoke to him, and Vidaurri answered that he did not understand English. Then he (Grimes) told me to ask him (Vidaurri) to whom did the stock belong. I then answered Grimes that Vidaurri could speak English as well as I could. Grimes answered, "That makes no difference; you ask him what I told you." I then asked him to whom the stock belonged. He replied that it belonged to him. Grimes then told me to ask him if he had the documents with him. I did so, and Vidaurri answered that he did not have the documents with him, but that the man that had sold the stock to him had gone to Laredo to get them. Vidaurri then started to go toward the stock, and Grimes told him not to go, and then Vidaurri turned around and came back and stopped. Then the defendant said to Vidaurri, "If you have this stock in here in good faith, why did you put them in here without asking permission to do so?" Vidaurri then answered, "You are just like a prick. No one else commands here." The defendant then said to him, "There are two calves here that belong to Mr. Bruni with your brand on them. What right had you to put your brands upon them?" Vidaurri then answered that he would put his brand on the top of Bruni's, and that if they (defendant and Bruni) would turn to cows he (the deceased) would put his brand on them also. These were the last words spoken, and then both made several movements, one to turn in one direction and the other in another, and then both made motions as if to draw arms and then the shooting took place. At this time Vidaurri was holding the reins in his left hand and he and the defendant were facing each other, and when the last words were spoken Vidaurri pulled the rein of his horse to one side and the defendant pulled out his pistol and shot. Both made the motion at the same time. At the time Vidaurri first put his hand on his hip the defendant at the same time pulled his pistol. Vidaurri put his hand across his body and downward toward his left hip, and this motion was made quickly. When Vidaurri said that he would put his brand on defendant and Bruni and jerked his horse quickly to one side the defendant pulled his pistol. The first motion was made by Vidaurri. Vidaurri was hit in the neck, on the right side. Vadaurri could speak English. After Vidaurri was shot he fell from his horse and the horse ran off. I did not see the left side of the horse as it ran off. It ran off in the direction of the stock that we had seized. I saw that horse again that day when it was brought back by Salvador Cuellar and Juan Vidaurri, and at this time I saw a carbine scabbard attached to the saddle on the left side. I was present on one occasion when Evaristo Riojas informed the defendant that deceased intended to put him out of the way. Riojas told the defendant that he (Riojas) had caught deceased brand-

ing a calf belonging to Bruni inside the fence, and that deceased had said: "You have caught me. Keep quiet now. What wages are you getting at the ranch?" That he (Riojas) had replied that he was getting $20 per month, and that then deceased said, "You are getting $20 per month? I will pay you $10 more if you will come and work for me and put the witness out of the way who is a witness against me about some stock that I sold to Bruni." These were all the words I heard said to defendant by Riojas.

On cross-examination witness stated: I work for A. Bruni. At the time this thing occurred defendant was also working for Bruni. I had been working for Bruni over two years, and defendant was working there before I came. Riojas was also working for Bruni. Pancho Guzman was also working for Bruni. Yes, sir, all of us were working for Bruni. I can not say that it is a fact that we were all anxious to get rid of the deceased. The owner of the ranch might have been. I was not. Mr. Bruni was the owner. We all live and work for Bruni. I do not know of any ill feeling existing between the defendant and the deceased, and had no reason to know if any such existed. Yes, sir, I knew of Vidaurri's having made complaint against defendant about branding cattle in the pasture and of Vidaurri's having defendant arrested about these cattle, and it is true that defendant made complaints against Vidaurri about stealing these cattle. I do not remember how long before the killing it was that the complaint was made. I do not know whether it was a month or less than a month. I do not know as to Vidaurri's having threatened to take this matter before the grand jury. Before the killing, and at the time after Grimes had ceased speaking with the deceased, the defendant is the man who commenced the conversation with the deceased. The first words that defendant said to Vidaurri were, "If you have this stock in good faith, then by whose orders have you put them in the pasture?" I was in charge of the pasture and am the only man who had the right to ask such a question. I did not ask it. The defendant had no right to ask such a question when I was present, and the only right defendant would have would be when I was not present. The next words said were by the defendant to Vidaurri, and were "With whose permission have you branded those calves that belonged to Bruni?" When the defendant said this the deceased replied, "You are a prick. You do not command here. I command here." When defendant asked deceased why he had branded those calves, Vidaurri replied that he had put his brand on top of Bruni's, and that if he (defendant) and Bruni were to turn to cows he would brand them also. To this defendant replied, "You will not brand me that way." These were the last words said, and then they fumbled around and shot. [Here witness again pointed out by objects in the room the relative positions of all the parties at the time of the shooting.] Continuing his testimony, he said: The horses were

about one hundred yards to the south of where we were. At the time when Vidaurri rode up we were all standing there talking. We were about thirty feet apart, and at this distance one may well hear what another is saying, but I am not positive as to the exact distance the one was from the other, but think I am more or less correct in this respect. I did not see any pistol on Vidaurri. Vidaurri had on a coat and vest and pants and overshirt. I am not positive as to his dress, but think he had on a coat. I am just as positive about the first as the last. I did not see any arms on him nor any Winchester. At the time the defendant fired at the deceased the deceased was moving his horse to and fro. I did not see deceased have his hands on the horn of his saddle the moment before the shooting. When they made the motions they both pulled their horses facing one another and deceased pulled his horse to the left side. The last words said were by the defendant, "You will not brand me." I was not then looking at the defendant, but I heard what was said. I had my eyes on both of them. At this moment I was watching both of them, because they were quarreling. It is true that I could not see them both at the same time, but when one would speak I would look at him, and when the other would speak I would watch him. I watched the man who last spoke. [Here witness was asked: "If you watched the man who last spoke, and the defendant was the man who last spoke, your eyes were fixed on the defendant at that time?" to which witness replied:] No, sir; I heard what was said. When I heard the last words spoken I was looking at the deceased, who was very angry, and when I turned toward the defendant he had his pistol pulled out. They did not give me time to watch them both. Did I not tell you that when one drew his pistol the other pulled his pistol? I would watch one and then the other. Did I not tell you that when Vidaurri pulled the rein of his horse the other pulled out his pistol, both at the same time? Yes, sir; I talked this matter over with the lawyers at Mr. Bruni's house here in Laredo. I notified Bruni of the killing some time after it had occurred. I am still working for Bruni.

On recross-examination witness stated: Vidaurri was in the habit of carrying a carbine. The cartridge belt found on the body of deceased had 44-caliber cartridges in it. These are used in Winchesters. I do not remember having seen defendant after shooting ride around the body with pistol in hand. As to the character of the deceased, he, as natural, would keep his word, because he was a man; and from that character he would be likely to carry out any threat that he would make. After the shooting the defendant started to go off, and I told him to stop. He did not say where he was going. We used no force to prevent his going. He only obeyed me when I told him to stop. After the shooting the defendant had his pistol in his scabbard. I do not remember having told you, Mr. Walton, down at Bruni's house,

about the motion made by Vidaurri. Yes, sir, you questioned me about it there.

Here defendant placed upon the stand as a witness in his behalf Victor Morel, who testified as follows: I was a custom house guard at the time Vidaurri was killed and remember the fact of the killing. On the 16th day of February, 1889, we were out on a scout, and in the morning when in about a mile of Duran's ranch we met Navor Garza, who informed us—Grimes and myself—about a large bunch of horses and cattle penned at the Lajas Ranch, which, he said had been crossed over the night before by seven or eight armed men at the Dolores Ranch, and that the trail of the stock led into Bruni's pasture. I then informed Grimes of what had been told me, and we agreed that we would call on Bruni's agent to find out what stock had been brought into the pasture on that day. It was late in the evening when we reached Bruni's ranch. On our arrival I inquired of Andres Garza, the man in charge, what stock had been brought into the pasture. He said none. I then told him what I had heard, and he then said that he would send two men to find out. These two men returned and reported having met Pancho Guzman, who gave them information as to a bunch of stock in the pasture. I then informed Grimes of the report, and we agreed to go and round up the pasture the next morning. At this time we summoned Garza and his herders as a *posse comitatus* to assist us. On the 17th, at sunrise or little after, we started—Grimes and myself— accompanied by Garza, Guzman, Porfirio, Rodriguez, and the defendant. We found some stock branded with a Mexican brand which Andres said did not belong to the ranch. Grimes and myself held the stock while Bruni's hands searched for more. In a short time the herders reported finding another bunch. Then Grimes remained with the first bunch and I went after the second. In a short time after I had returned with second bunch Andres came up and reported having met an old man and a boy who had come with the stock. I then went after the man and boy and overtook them on the Laredo road on the other side of the Lajas. I then took the boy to one side and questioned him about the stock, and he denied knowing anything about the stock, as did the old man.

Pancho Guzman, a witness for the defendant, testified as follows: I remember the circumstances of the killing of Alejandro Vidaurri. I was about one hundred steps from the place at the time. I did not see the deceased when he was shot nor the defendant when he fired the shot. I heard the shot and just after saw a horse running by me with a carbine on the saddle. The horse passed me within six paces. I was watching the stock at the time. Was in the employ of Bruni. Andres Garza was the foreman of Bruni's ranch.

On cross-examination witness stated: When this happened I was at work for Bruni and lived at his ranch. During the last term of this

court I staid at the house of Bruni here in Laredo. I am staying at his house now. I have lived with Bruni ever since the killing took place. I told about this carbine business while I was at Bruni's house.

On redirect examination witness stated: When the horse passed me the carbine was swinging backward and forward. On the night I talked this matter over at Bruni's house I only spoke to Bruni. Yes, sir; I also talked with the lawyers and with Bruni. You, Mr. Walton, asked the question and Bruni interpreted. At this time Andres Garza, Evaristo Rodriguez, Pancho Guzman, and Justo Cruz were there on the outside of the house.

The defendant next introduced Justo Cruz, who testified: I knew the deceased and know the defendant. I do not know the beginning of the hard feelings between the deceased and defendant. I never was pursued by any one with a Winchester. I was pursued by some one with a pistol and I drew my pistol because Don Alejandro came toward me with his carbine in his hands. Then Alejandro said, "Excuse me; I thought you were Bernardino Gonzalez. I am just trying to get an opportunity to kill him." I communicated this to defendant about the middle of February before the killing.

On cross-examination witness stated: I attended the preliminary trial of defendant at Carrizo. I was not summoned there as a witness. Mr. Bruni took me down there with him. I was then in Bruni's employ and am still in his service. I am staying at Bruni's house here in Laredo.

Hilario Riojas, a witness for the defendant, testified as follows: I know the defendant and knew the deceased. I once heard the deceased say something about defendant. This was last year and happened in this way: Andres Garza had sent me out to look around the pasture, and while out and as I was coming alone one side of the fence I heard a calf bellow and went toward the spot from where the sound came, and there found the deceased with a calf down on the ground trying to put another brand upon it. As I was looking after the pasture I asked the deceased what he was doing. Deceased replied that it was none of my business. I then said to him that I intended to inform on him. He then begged me not to say anything about it. Deceased then asked me what amount of wages I was receiving from my employer. I told him, and he said, "Quit; I will give you more to work for me. Come with me and we will take out some unbranded calves." I replied that I did not see how we could take out any calves when they were watching the pasture all the time. Then deceased said, "Killing Bernardino; then we can do as we please." I told Andres Garza in the presence of defendant of this matter before the deceased was killed. I do not know anything as to the character of deceased. I have never known him as a fighting man. After this I carried a note from deceased to defendant. This was in the latter part of January or first of

February, 1889. I received the note from deceased and delivered it to defendant at request of the deceased.

On cross-examination witness stated: At the time I speak of I was in the employ of A. Bruni. I can not say that we who worked for Bruni disliked deceased. I have nothing to claim against him. Do not know as to the others being afraid of him; I was not. Do not know whether Bruni and the others wanted to get him out of the pasture. At the last term of this court I was across the river in New Laredo. I did not come then to testify. I was at Bruni's house over there. I was not told by Bruni not to come so that defendant could get a continuance. I am now working for Bruni and am stopping at his house. Have been at his house since court opened.

Louis Pasco, a witness for the defendant, stated: I know Andres Garza, whose written testimony has been read. I know his character for truth and veracity in the community in which he lives. It is good.

On cross-examination witness stated: I am one of the parties who swore the defendant's affidavit for a change of venue in this case at this term of the court. I am a partner of A. Bruni.

A. Bertani, a witness for defendant, testified: I know Andres Garza, the witness last mentioned. His character for truth and veracity is good.

On cross-examination witness stated: I am one of the persons whose names are signed to defendant's affidavit for a change of venue. I did not swear that defendant could not get a fair trial in this county. I only wanted to see the case taken to some other county.

Here defendant introduced and read in evidence the following letter, which is admitted is in the handwriting of deceased and the same mentioned in testimony of Riojas:

"*Mr. Bernardino Gonzalez:*

"The present is to inform you that the calves I have of Bruni's brand is a matter that does not concern you and I have to brand all I can, as you and 'la chingado' is the same thing, and I pray God that I may never meet you alone, as I have to 'joderte' for meddling in my matters. You act as if you were to inherit Bruni's possessions, you being only a 'chingado' servant, so it is better for you to shut up your jaw and do not go and meddle with what does not concern you, much less in my affairs. I will have to destroy that unfortunate ranch, including yourself and old Andres. You are not worth a 'chingado,' as you are only meddlesome and act as if you were the owner of the ranch. Without anything more you know that if you keep on meddling with what does not concern you I have to 'joderte.'

　　　[Signed]　　　　　　　　　　"ALEJANDRO VIDAURRI."

Here defendant took the stand and stated: I am Bernardino Gonzalez. I can not speak English. I knew Alejandro Vidaurri. I shot

and killed him. Before the killing Riojas and Cruz had informed me of threats made by deceased against me. When I shot deceased he was on horseback. I shot him because he wanted to kill me. He made a movement as if to draw arms. Alejandro first made the movement. I knew that he was armed. At the time that I shot him I did not see any arms on him. I saw a cartridge belt with cartridges around his waist. He was in the habit of carrying arms, sometimes a pistol and at others a carbine. I believed that deceased was going to draw arms to kill me.

On cross-examination defendant stated: I knew that deceased had threatened my life. I was on good terms with him. Deceased did not come up to us on that day in his shirt sleeves. Deceased had on a coat, vest, and shirt. I am just as positive about his having had on a coat as I am that he made the movement about which I have testified. I was the one who opened the conversation between deceased and myself. I did so because I had as much right as Andres Garza had. I was in the employ of Bruni and had the right to speak. I spoke to him about a matter that was likely to anger him, notwithstanding I had been informed that he had threatened my life. I did not intend at the time to provoke a quarrel or to kill him. I did not take advantage of my position as being surrounded by half a dozen armed men to bulldoze deceased. If he had not made that motion I would not have killed him. At the time of the shooting we were both on horseback and facing one another. Vidaurri was looking straight at me and his horse was facing me. When I saw him make the motion I spurred my horse four or five steps toward him and fired. When I shot he was looking straight into my eyes. I can not tell how I came to shoot him in the side of the neck if he was facing me at the time. It is not true as stated by the boy, that when I drew my pistol deceased pulled his horse to one side to get out of the way and away from me. After deceased made the motion I speak of I had time to jump my horse four or five steps toward him and draw my pistol and fire. Up to this time deceased had drawn no weapon nor made any other effort to do so beyond the motion mentioned before.

The charge of the court is as follows:

Gentlemen of the Jury: The defendant Bernardino Gonzalez stands indicted for the murder of Alejandro Vidaurri, charged to have been committed in Zapata County, Texas, on or about the 17th day of February, A. D. 1889, by shooting him with a pistol, and said cause has been by change of venue transferred to this county for trial, and as the law of this case you are instructed:

1. Every person with a sound memory and discretion who shall unlawfully kill any reasonable creature in being within this State, with malice aforethought, either express or implied, shall be deemed guilty of murder.

2.   Murder is distinguishable from every other species of homicide by the absence of the circumstances which in law would reduce the offense to negligent homicide or manslaughter, or which would in law excuse or justify the homicide.

3.   All murder committed with express malice is murder of the first degree, and all murder not of the first degree is murder of the second degree.

4.   Malice in its legal sense means a wicked intention to do a wrongful act or injury to another from personal gratification or motives of revenge, without legal justification or excuse.

5.   Express malice as herein used is when a man with a cool and sedate mind, in pursuance of a formed design to kill another, or to inflict upon him some serious bodily injury which would probably end in depriving him of life, does, without legal justification, mitigation, or excuse, kill such person.

6.   Express malice as above defined is never inferred or implied alone from the act done or from the means used in doing it, but it must be proved like any other fact in the case by such evidence as may reasonably be sufficient to satisfy the jury of its existence beyond a reasonable doubt at the time of the commission of the unlawful act.

7.   Malice is implied when it satisfactorily appears that a homicide was intentionally committed, and the facts show that it was neither with express malice nor under circumstances justifying, mitigating, or excusing the act.   In such a case the law implies malice and the offense is murder in the second degree.

8.   Applying the foregoing definitions to the facts of this case, if you shall believe from all the evidence beyond a reasonable doubt that defendant Bernardino Gonzales, in said Zapata County, Texas, on or about the 17th day of February, A. D. 1889, did kill said Alejandro Vidaurri by shooting him with a pistol in the manner and under the circumstances alleged in the indictment, you will find him guilty of murder and the degree of such murder.   And if from the evidence you find that said murder was committed with express malice as defined in the fifth paragraph of this charge, you will find him guilty of murder in the first degree and assess his punishment at death or by confinement for life in the penitentiary.   If, however, you have a reasonable doubt of such murder being of the first degree you will acquit him of this degree of murder, and then further consider of the degree of such murder; and if from the evidence you believe beyond a reasonable doubt that said murder is of the second degree as defined in the seventh paragraph of the foregoing charge, you will so find and assess defendant's punishment at confinement in the penitentiary for any number of years not less than five.

9.   You are further instructed that in addition to his plea of not guilty the defendant in this case interposes the plea of self-defense, and

upon this issue and as the law governing the same you are now instructed: (1) Homicide is justifiable in the protection of the person from any unlawful and violent attack, and in such case all other means must be resorted to for the prevention of the injury, and the killing must take place while the person killed is in the act of making such unlawful and violent attack, or while the person killed is doing some hostile act or making some hostile demonstration that would, viewed from the standpoint of the slayer, produce in his mind a reasonable fear or expectation of death or of some serious bodily injury. (2) The person who is thus violently attacked or against whom such hostile act or demonstration is made is not bound to retreat to avoid the necessity of killing his assailant. (3) Applying the foregoing definitions to the facts of this case upon the issue now submitted to you, you are charged that defendant would be justified in killing the deceased if it is shown to have been done to prevent the deceased from murdering or maiming him, or if it is shown that at the very time of the killing or immediately preceding such killing deceased had made or was in the act of making some hostile demonstration toward the defendant such as would produce in his mind a reasonable fear or expectation of death or of some serious bodily injury; but in that case to justify the killing it must reasonably appear from the acts or words coupled with the acts of the deceased that he intended to murder, maim, or inflict some serious bodily injury upon the defendant, and the killing must have taken place while the deceased was in the act of committing such offense or after some act done by him showing evidently an intention to commit such offense. Therefore, if you believe from the evidence that the defendant at the time of the homicide believed that his life was in danger, such fear being produced by hostile acts on the part of the deceased, and that at the time he fired the fatal shot it reasonably appeared to him from all the circumstances of the case, viewed from the defendant's standpoint alone, that the deceased was about to shoot him with a gun or a pistol, then the defendant would be justifiable, notwithstanding it may appear as a fact that defendant was in no danger at the time of the homicide, and if you so believe you will acquit him. (4) Again, if the jury shall find from the evidence that prior to the homicide the deceased had threatened the life of the defendant, such threats of themselves would afford no justification for the offense unless it be shown that at the time of the killing the deceased had done or was in the act of doing some act or was making some demonstration manifesting an intention then and there to execute or carry out such threats, or which was reasonably calculated in view of all the evidence and circumstances of the case considered from defendant's standpoint to produce and did produce in the mind of the defendant the belief that deceased was about to execute such threats, and in that event defendant would have the right to act upon such reasonable appearance of

danger, notwithstanding such danger might not in fact have been real, and the killing under such circumstances would be justifiable.

10.   You are further instructed as a part of the law of this case, and as a qualification of the foregoing charge on the law of self-defense, as follows: (1) If a person by his own wrongful act bring about the necessity of taking the life of another to prevent being himself killed, he can not say or claim that such killing was in his own necessary self-defense, but the killing will be ·in such case imputed to malice by reason of the wrongful act which brought it about or malice from which it was done.   (2) The law is that he who brings on an affray in which he intends to wreak his malice can not avail himself of the shield of self-defense though his own life be imperiled in the affray, and that the slayer, if he provoked the contest or produced the occasion *with the apparent intention of killing the deceased or of doing him some serious bodily harm,* is guilty of murder although he may have done the act of killing suddenly and without deliberation to save his own life. In such a case the law allows no justification and no reduction of the grade of the homicide below that of murder.   (3) If you believe, therefore, beyond a reasonable doubt that defendant by his own wrongful act brought about the necessity of killing deceased, or provoked the difficulty with the apparent intention of taking the life of the deceased, intentionally and with a view thereto, and that under such circumstances he shot and killed deceased, then defendant's plea of self-defense will not avail him, and the homicide would be murder in the first or second degree according as the facts and circumstances may justify the jury in finding.

11.   But if the defendant provoked the difficulty without *any intention to kill or inflict serious bodily injury,* and suddenly and without deliberation did the act of killing under the immediate influence of sudden passion arising from adequate cause as hereinafter explained to you, while the homicide would not be justifiable it would· be manslaughter within the meaning of that term as now hereafter defined.

12.   Homicide is the destruction of the life of one human being by the act, agency, procurement, or culpable omission of another.

13.   Manslaughter is voluntary homicide committed under the immediate influence of sudden passion arising from an adequate cause, but neither justified nor excused by law.

14.   By the expression "under the immediate influence of sudden passion" is meant: (1) That the provocation must arise at the time of the commission of the offense, and the passion engendered is not the result of a former and different provocation.   (2) The act must be directly caused by the passion arising out of the provocation.   It is not enough that the mind is merely agitated by passion from some other provocation.   (3) The passion intended is either of the emotions of

the mind known as anger, rage, sudden resentment, or terror, rendering the mind incapable of cool reflection.

15. By the expression "adequate cause" is meant such as would commonly produce a degree of anger, rage, sudden resentment, or terror in a person of ordinary temper sufficient to render the mind incapable of cool reflection.

16. Angry and insulting words coupled with sudden gestures as if to draw a deadly weapon on the part of the person killed would constitute adequate cause, in the view of the case.

17. In order to reduce a voluntary homicide to the grade of manslaughter it is necessary not only that an adequate cause existed to produce the state of mind referred to in the foregoing charge, but also that such state of mind did actually exist at the very time of the commission of the offense.

18. Applying the above instructions on the law of manslaughter to the facts of this case, if you believe from the evidence that defendant provoked the difficulty that resulted in the death of the deceased, or by his own wrongful act produced the necessity for taking deceased's life, but with no apparent intention to kill the deceased or to inflict upon him some serious bodily injury, but suddenly under the immediate influence of sudden passion arising from adequate cause as above explained to you, and that under such circumstances he shot and killed deceased, you will find him guilty of manslaughter and assess his punishment at not less than two nor more than five years in the penitentiary.

19. Again, if you find from the evidence that at the time of the homicide deceased used angry and insulting words to the defendant and accompanied such words with a hostile demonstration as if to draw a deadly weapon, and that defendant's mind was so angry, enraged, or struck with sudden terror or resentment as to render it incapable of cool reflection, and that while laboring under such a condition of mind he shot and killed deceased, you will find him guilty of manslaughter and assess his punishment as above prescribed.

20. The jury are the exclusive judges of the facts proved, of the credibility of the witnesses, and the weight to be given to their testimony.

21. The law presumes the defendant to be innocent until his guilt is established by legal evidence beyond a reasonable doubt, and if the jury entertain a reasonable doubt of defendant's guilt they will acquit him.

22. If you believe from the evidence that said defendant was the employe of one A. M. Bruni, and it was his duty to attend to and take care of his horses and cattle then ranging in his pasture, or if you believe from the evidence that said defendant had been summoned by

United States inspectors to assist them in making a seizure of horse stock, and he was so assisting them when and where the killing took place, if any, then you are instructed that the defendant had a legal right to be there, and make all reasonable inquiries as to his employer's cattle of deceased and it would be no violation of law.

The following instructions were given at the request of the defendant:

1. A man is not required by the law to retreat when unlawfully assailed in a manner that is reasonably calculated to produce the impression on his mind that his life is in danger or that he is in danger of serious bodily injury from the assault, and this whether the assailant be armed in fact or not. An assault may be made by a demonstration or movement apparently calculated or evidencing an intention to get hold of deadly weapons for the purpose of using them illegally, and in such case the party has the legal right to defend himself the same as if the party making the movement or demonstration was actually armed and actually intended to grasp and use such arms. And you are charged here as the law of this case that if you believe from the evidence that the deceased did not actually and in fact have arms on his person at the time he was shot, yet if you further believe from the evidence before you that at the time the shot was fired the deceased had made or was in the act of making a movement as if to draw a firearm, and if from that movement or demonstration the impression was made on the mind of defendant that deceased was in the act of drawing a firearm to kill him or attempt to do so, then defendant was not called on to retreat, but had the right to stand and defend himself even to the taking of the life of deceased; provided you do not further believe that the defendant provoked the difficulty with the deceased with the apparent purpose to then and there take advantage thereof and kill him (deceased) or to do him serious bodily harm, and if you so believe you will acquit the defendant, for in that case he would be guilty of no degree of culpable homicide.

2. While it is the law that a party may not provoke a contest or quarrel with another for the purpose of killing him, yet the fact whether a contest or quarrel is provoked is always a question for the jury. No general rules or guides can be laid down, but every case must stand on its own facts.

3. The jury are instructed that when a defendant is placed on the witness stand in his own behalf said witness stands before you in the same relation as all other witnesses in the case, and his testimony is to be weighed and considered under the same rules as are applicable to other witnesses.

Additional instructions were requested by the defendant and were refused by the court. They will be found set forth in the brief of counsel for appellant.

*Nicholson & Dodd, W. Showalter, Bethel Coopwood,* and *Walton, Hill & Walton,* for the appellant.—This is an appeal from a second conviction for murder in the first degree and punishment fixed at imprisonment for life.

We complain of various errors committed by the court, and among them:

1. Overruling the application for continuance.

2. In admitting evidence.

3. In refusing to exclude from the jury evidence improperly admitted.

4. In refusing charges asked by defendant.

5. Because of the errors in the charge in chief.

6. Because of improper remarks by State's counsel in closing the argument before the jury.

7. And because counsel for State was permitted to reread reproduced testimony in his final argument.

Much comment might be made on the trial of this case, wherein palpable error transpired and legal wrong was done to the defendant, but we refrain and address ourselves to the case and the law applicable thereto, feeling perfect confidence that a reversal will be promptly ordered.

*First.* The court erred in overruling the application to continue. The point was reserved by proper bill.

Andres Garza was defendant's most material witness. His testimony if believed, and there was no real reason to doubt its truth, would under fair consideration and impartially weighed warrant defendant's acquittal. He was wholly disinterested, an intelligent man, and American speaking Mexican. There was an ineffectual effort made to shake him on a rigid cross-examination; after which his good reputation for truth was sustained.

The point of the application to continue was this: Garza had been examined on the former trial of the case and his testimony reduced by stenography to writing and then substantially if not literally embraced in the old appeal statement·of facts. He was duly subpoenaed by defendant on 20th July, 1889; on the 24th of the same month attachment by State was issued for him; attached same day and was present in court and testified. About November, same year, the witness went into Mexico on business and had not returned home; when he left the case was pending on appeal in the Court of Appeals. Process issued for him returnable to the town at which the case was tried, but not served, because the witness was out of the country. In all particulars defendant brought himself within the law to entitle him to a continuance. He desired and was entitled to the personal presence of said witness; he was not able to erect the proper predicate to legally authorize him to reproduce the testimony of the said witness, for he

was only temporarily without Texas territory—had not changed his domicile—but the State waived the predicate and thereby in legal effect forced defendant to use the written testimony in place of having the witness personally present. The State had defendant in *quasi* constraint and absolutely compelled him to the use of the deposition.

The question comes, that defendant having brought himself within the law of continuance, was it proper to drive him to take inferior testimony to that to which he was entitled? It can not be questioned but what the deposition was, as testimony, inferior to oral testimony. No lawyer and no judge will so stultify himself as to so say.

The constraining of defendant to use the deposition under the circumstances was tantamount to an admission by the State that if Garza was present he would swear substantially what was written in the deposition—no more and no less. That was not enough even if the State's officer had authority to make any admission. The admission should have gone further; it should have gone to the extent that the testimony of the witness as written or admitted was true; not that he would so swear if present, but that what he had sworn was true. Skaro v. The State, 43 Texas, 88; Willson's Crim. Stats., sec. 2184.

This question does not come within the decision of Wooldridge v. The State, 13 Texas Court of Appeals, 443, nor Nolen v. The State, 14 Texas Court of Appeals, 474. There the defendant could supply the absent testimony by testimony of equal degree or dignity; here not so, because if defendant's absent testimony could be apparently supplied it was with that which was of inferior quality.

Neither was the evidence merely cumulative, as the qualification to the bill states. The testimony was substantially material, and in some points the only testimony before the jury. Of all the witnesses who testified Garza had the best opportunity to know how and why the meeting happened between defendant and deceased and the actual occurrences taking place on the ground where the killing took place. Besides, if only cumulative, still it was material and vital, in that the defensive facts sworn to by Garza and other witnesses were disputed. See authorities cited in third paragraph, section 2165, Willson's Criminal Statutes, page 156 of Code of Criminal Procedure.

*Second.* During the trial the matters transpired that are certified in bill of exception No. 3.

The questions were so put by the State to Mrs. Vidaurri as to permit pertinent answers from her if she knew anything, and in such way that there was no room for defendant to object thereto. To the questions followed the answers, and they were out before their irrelevancy and hurtfulness could be known and stopped. When they were all out defendant made a motion—a poor, a very poor privilege—to withdraw from the jury the whole testimony of Mrs. Vidaurri so far as it could or did appear to be hurtful to defendant and not pertinent to the

issues. This motion the court overruled, and said testimony was left in the minds of the jurors to work out its own effects. The testimony was as follows: She knew deceased, who was her husband; also knew defendant. She overheard a conversation between deceased and defendant in December, 1887, or January, 1888. Defendant told deceased that the feast (an annual gathering for pleasure by Mexican custom) was about over, and he (defendant) was about busted; that he had sure means to get some money, and asked deceased to assist him, as a tool, by writing a paper to defendant inviting him (defendant) to buy mules across the river in Mexico; that Antonio Bruni had offered him (defendant) money to kill him (deceased). That deceased said he (deceased) did not have the means to go into partnership with any one. Defendant replied that he (defendant) did not want him (deceased) to go into partnership with him (defendant); that he only wanted him (deceased) to go along with him into Mexico, and that he (defendant) could get all the money he wanted from Antonio Bruni, and a dark horse, as all he wanted was to show Bruni that he (deceased) was going into Mexico with him (defendant). Defendant further said that he (deceased) should have no fear from him (defendant), as he (defendant) was as good a friend as he (deceased) had. That she (witness) heard another conversation between her mother and defendant some time in February or March, 1888, in which defendant said: "Bruni's boy is dead and the other boy was better; that Bruni wanted to hire him (defendant) to stay at his (Bruni's) house and take care of the boy, but that it was not to take care of the boy, as Bruni was telling him all the time that he (Bruni) wanted him (defendant) to kill deceased, Alejandro Vidaurri."

The motion to strike out and withdraw from the jury the foregoing testimony put forward these grounds: The same appears to have been introduced by the State for the purpose of establishing express malice on the part of the defendant in killing deceased, and said testimony failing to even tend to the establishment of express malice is irrelevant, but if left withdrawn from the jury will have a tendency to prejudice the jury against defendant because of the unfaithful relations said testimony places defendant in toward Bruni; and because the only effect of such testimony is to prove the degradation of defendant to his prejudice and injury. The motion was overruled.

The witness was cross-examined. She said among other things: When the first conversation occurred defendant, deceased, and I were present. It was in Laredo. I was in the room and heard all that was said. Defendant and deceased were then friendly, and defendant would come to our house to visit my husband (deceased). On the occasion of the second conversation mother and I were at the ranch; after the conversation defendant ate and slept at the ranch that night, but never returned again. I was present at the conversation between mother and

defendant. I told my husband of this conversation and requested that defendant come to the house no more; but deceased said "he was not afraid; that he and defendant were good friends."

. These conversations were fixed as occurring, the first in the last of December, 1887, or first of January, 1888, and the latter in February or March, 1888. The killing is alleged to have occurred on the 17th of February, 1889, and so proved.

Perhaps the world of legal literature and all the books in which are recorded trials of criminal cases may be searched and no parallel, not even kinship, with this move and accomplishment on the part of the State will be found. Manhood, fidelity, and honor were torn out of defendant by the wife of deceased, and he thrown down prostrate, helpless, dishonored, disgraced, and degraded by testimony which told nothing of the killing and nothing of the condition of mind which influenced defendant to do the killing.

The jury was authorized to view him as a traitor to his friend, as a man without honor, and as an unfaithful servant to his employer. Fore v. The State, 5 Texas Ct. App., 253.

*Third.* The fourth bill of exception perpetuates the following transaction:

The State examined Alejos Torres, who referred to a criminal charge made by deceased against defendant about some cows before a magistrate in Zapata County; and thereupon the State asked the witness the following question: What was the charge brought by deceased against defendant before the magistrate? Defendant objected to the question, because it was an effort to prove by parol the contents of a document required by law to be in writing and filed or deposited with a judicial officer; and because whatever the contents they were collateral only. Objections overruled. Defendant then asked permission to question the witness as to the extent of his knowledge of and about the contents of the charge so lodged by deceased against defendant, in order that if the witness did not have sufficient knowledge of the contents of the charge to testify. thereto his testimony should not go to the jury and make an impression on the jury prejudicial to defendant. This request the court refused. The witness then said: "The charge made by deceased against defendant was asking him how he (defendant) got those cows that had Mr. Bruni's brand upon them. The cows spoken of were cows claimed by deceased. The charge was made before the justice of the peace."

We think the objections to this testimony should have been sustained. It was proving the contents of a statutory criminal charge that in fact existed and was on file, by parol.

If this be really what was done, then no question remains. It was not only flat but stale error. But there is a qualification to the bill, and this is it:

"The above is approved, with the additional statement as to what the witness said, viz.:

"I can't speak the English language. I did not read the charge made by Vidaurri. The judge was repeating it there in Spanish. I was hearing what he was telling. When I say that deceased made a charge against defendant, and that afterward defendant made a charge against the deceased before the magistrate, I mean to say that is what I heard them saying one to the other in the presence of the magistrate. What I stated as to a charge one against the other, is what I heard them say in the presence of the magistrate."

If the above qualification of the bill be pertinent and true, then there is a pair of ears from the head of an ass out of place. Counsel for defendant should each have a pair of the aforesaid ears on his head. In the one instance the objection was proving written instrument by parol. In the other the objection was "hearsay," or else no objection; and yet by the qualification we are made to put the objections that applied to the first conditions to the second state of facts.

These qualifications to bills are usually the work of district attorneys who have little if any care for the citizen under condemnation. If the bill be not right the judge should not sign it; but when he qualifies and signs, then as a rule the bill as taken by defendant is pointless. We, or at least the writer (W. M. Walton), don't believe that this high court should favor or look on with any degree of allowance where the soul of a good bill of exception is cut out by an *ex parte* qualification. If a bill speaks the truth, let the court sign it; if it be false in the judgment of the court, refuse it and force counsel and client back on the legal right to prove the bill by bystanders at the case, because of his or their professional perfidy in presenting a false bill.

*Fourth.* Defendant in due form and in proper time excepted to the charge in chief of the court, (1) as a whole, and (2) to specific parts.

[Here the charge of the court is set forth in the brief. For the charge see the statement of the case.—REPORTER.]

The exceptions taken to the whole and to specific portions of said charge are as follows:

1. Exception is taken because the "reasonable doubt" was not sufficiently, explicitly, and plainly given, as the right of defendant and the law demanded and required.

2. That the sixth and seventh paragraphs of the court's charge do not correctly state the law, in this, that they exclude the question of reasonable doubt.

3. Because the charge of the court taken as a whole does not correctly and plainly inform the jury of the law of the case as applicable to the facts in evidence, and because as a whole it is contradictory and confused to such an extent as to mislead and confuse the jury.

4. Defendant further excepts to subdivision 1 of paragraph 9 of the charge, on the subject of self-defense, in the words: "1. Homicide is justifiable in the protection of the person from any unlawful and violent attack, and in such case all other means must be resorted to for the prevention of the injury, and the killing must take place while the person killed is in the act of making such unlawful and violent attack, or while the person killed is doing some hostile act or making some hostile demonstration that would, viewed from the standpoint of the slayer, produce in his mind a reasonable fear or expectation of death or some serious bodily injury." (1) Because it does not truly give the law of self-defense. (2) Because of the use of words, "and in such case all other means must be resorted to for the prevention of the injury, and the killing must take place while the person killed is in the act of making such unlawful and violent attack."

5. That said subdivision 1 of paragraph 9 is drawn to meet and explain the law of article 572, and not that of article 570 of the Penal Code, and is not applicable to the facts in this case.

6. Because the court did not explain to the jury the law arising out of article 570 of the Penal Code, which treats of the law of self-defense, and would have been applicable to the case and the facts of the case.

7. Defendant excepts to paragraph 11 of the charge, as follows: "11. But if defendant provoked the difficulty without any intention to kill or inflict serious bodily injury, and suddenly and without deliberation did the act of killing under the immediate influence of sudden passion arising from adequate cause, as hereinafter explained to you, while the homicide would not be justifiable, it would be manslaughter within the meaning of that term as now hereinafter defined." (1) Because it does not state the law of this case on the facts. (2) Because it does not draw the proper distinction so as to carry to the minds of the jurors the degree of culpability that arises out of a killing where the difficulty is provoked by the slayer. (3) It fails to state that if the words were spoken provokingly, but with no intention to provoke a difficulty, then the right of full self-defense would not be cut off. (4) Because the provocation in this case were the words, not acts, and the said charge to all intents and purposes assumes that they were intended to provoke a difficulty and did provoke one. (5) Because it fails to advise the jury at what time defendant's full right of self-defense would be restored, even though he provoked the difficulty not to kill or do serious bodily harm but to commit a misdemeanor. (6) It fails to advise the jury that if the words were uttered with no intention then and there to provoke a difficulty, but were in badinage or idleness or thoughtlessness, but with no intent to provoke a difficulty and take advantage of it and do deceased some harm to life or body, then that if a killing ensued defendant would not be cut off from his full right of self-defense, and that a killing under such circumstances would

not necessarily be culpable homicide. (7) It fails to advise the jury of the law that before a killing occurring in a difficulty arising from a provocation given will be culpable homicide the provocation must have been given with the intention—that is, there must then and there have existed an intention at the time the provocation was given that a difficulty should arise from the provocation, and that in the difficulty the provoker would do and intended to do his adversary bodily harm or take his life; nor was this principle of law, in whole or in part, in substance or shadow, conveyed to the jury by the court, but on the contrary when the principle was invoked by defendant it was denied and refused.

8. Defendant excepts to the third subdivision of paragraph 9 of the court's charge, as follows: "3. Applying the foregoing definitions to the facts of the case upon the issue now submitted to you, you are charged that the defendant would be justified in killing the deceased if it is shown to have been done to prevent the deceased from murdering or maiming him, or if it is shown that at the very time of the killing or immediately preceding such killing deceased had made or was in the act of making some hostile demonstration toward the defendant, such as would produce in his mind a reasonable fear or expectation of death or of some serious bodily injury, but in that case to justify the killing it must reasonably appear from the acts or words coupled with the acts of the deceased that he intended to murder, maim, or inflict some serious bodily injury upon the defendant, and the killing must have taken place while the deceased was in the act of committing such offense, or after some act done by him showing evidently an intention to commit such offense; therefore, if you believe from the evidence that the defendant at the time of the homicide believed that his life was in danger, such fear being produced by hostile acts on the part of the deceased, and at the time he fired the fatal shot it reasonably appeared to him from all the circumstances of the case, viewed from defendant's standpoint alone, that deceased was about to shoot him with a gun or pistol, then defendant would be justifiable, notwithstanding it may appear as a fact that defendant was in no danger at the time of the homicide, and if you so believe you will acquit him." Because: (1) It throws the burden on the defendant. (2) It puts burden of proof on defendant. (3) It puts onerous conditions on defendant. (4) In the use of the word "evidently" in the latter part of first paragraph of said subdivision. (5) It limits the appearance of danger to defendant's comprehension and appreciation of danger, when the criterion of when and how to act is by law limited by the terms in substance, "that the presence of present danger would suggest itself to a man of reasonable and ordinary courage and prudence" and entitle him to take defensive action, whereas the rule as laid down by the court gives a rule of law as varied and as full of degrees as there are

differences in the courage, calmness, and prudence of men in mankind.

9.   The like objection is taken to the fourth subdivision of paragraph 9 of the court's charge, and this further: That it requires before the defendant can justify that the appearance of danger should not only be reasonably calculated to produce the belief of the present danger, but that such belief was produced on defendant's mind.   It burdens defendant with too many conditions and contingencies of an onerous character.

10.   Defendant excepts to paragraph 10 of the court's charges: (1) Because in view of the facts of this case it is apparent that the homi- cide was committed after a wordy altercation between defendant and deceased; that one word brought on another until anger was aroused and then the killing occurred.   (2) Because defendant opened the conversation or wordy altercation he was not thereby deprived of full right of self-defense, unless the opening remark was made backed by a then present intention to push on from word to word, and remark to remark, until difficulty arose, and in that difficulty take life, etc.   (3) It appears that the transaction was progressive, going from bad to worse until the climax was reached.   The jury ought in fair reason to have been given law light on the matter, and though not given by the court was offered by defendant and rejected and refused by the court.

11.   And defendant especially excepts to sixth, seventh, and eighth paragraphs of the court's main charge.   (1) Because the eighth paragraph fails to correctly state the law as it is when it appears to be connective or refer to other charges given upon the other phases of the case.   (2) Because it is so worded and disconnected with other charges as that a jury unaccustomed to think logically might be misled to the injury of defendant.   (3) Because it tells the jury without any reference to the doctrine of self-defense or the law applicable thereto that upon a given state of facts they will find defendant guilty and of what degree. (4) Because the same does not correctly charge upon 'reasonable doubt, and which the special request of defendant that was refused cured; and defendant specially excepts to all of that portion of the court's main charge in reference to the doctrine of self-defense, because it does not correctly state the extent of said doctrine, and because the third paragraph of the court's charge upon the doctrine of self-defense is itself contradictory and so worded as to tend to mislead and confuse the jury to the hurt of defendant, and because it makes the right of self-defense depend upon the fact that at the time of the killing, or immediately preceding the killing, deceased had made or was in the act of making some hostile demonstration toward the defendant such as would produce in his mind a reasonable fear or expectation of death or some serious bodily injury, and in that case that it must reasonably

appear from the acts, etc., of the deceased, without properly confining said hostile acts as they appeared to defendant. And because the effort to heal the defect is not so connected as to limit the acts as they appeared to defendant at the time, taking into consideration all the facts and circumstances.

Defendant excepts to the tenth paragraph of the court's main charge, because it does not correctly state the law, and for reasons defendant will hereafter more fully state.

Defendant excepts to all that portion of the court's main charge upon manslaughter, because it does not correctly charge the law in reference to when a homicide constitutes manslaughter. Defendant objects to subdivision 1 of paragraph 9 of the court's charge, because the same puts a burden upon defendant not justified by law; also to subdivision 2 of paragraph 10, because of the embracing of the words, "with the apparent intention of killing the deceased or of doing him some serious bodily harm;" also subdivision 3 of paragraph 10, because the whole of said paragraph 10 assumes that defendant brought on the difficulty by his own wrongful acts. Also the following words in subdivision 3 of paragraph 9, viz.: "Or if it is shown that at the very time of the killing or immediately preceding such killing deceased had made or was in the act of making some hostile demonstration toward defendant such as would produce in his mind reasonable fear or expectation of death or some serious bodily injury, but in that case to justify the killing it must reasonably appear from the acts or words coupled with the acts of the deceased that he intended to murder, maim, or inflict serious bodily injury upon the defendant, and the killing must have taken place while the deceased was in the act of committing such offense, or after some act done by him showing evidently an intention to commit such offense."

*Fifth.* State's counsel in closing the case proposed to read and did read, over the objections of defendant, from the cross-examination of the reproduced testimony of the witness Garza, for the express purpose of emphasizing what was claimed to be a contradiction in his testimony.

Defendant insisted that if part of said testimony was read in such closing argument the whole should be read. This was assented to by defendant, but the court overruled the objection to the reading of the fragment.

It will be observed that the qualification to the bill recites the turning point in the evidence and puts defendant in the attitude of a willing readiness to engage in the conflict, which was inconsistent with and contradictory of his testimony in chief; but whether that was so or not, the act of the State's counsel made the contradiction or inconsistency as read obscure, if it did not bury the contra-testimony of the witness.

We take it that the State would have had the same right to recall Garza if he had been personally examined and require him to repeat the alleged contradiction as it had to read the fragment from the deposition. Where lies the difference? In what does the difference consist? The defendant's mouth was closed; there was no more testimony, no reproduction of testimony, no more argument for him. At such a critical stage in his case to permit the State to reproduce the cross-examination of the defendant's main witness and by the act to strike out his truth and integrity and to re-enliven or reawaken in the minds of jurors that this witness had contradicted himself on the turning point in the defense, was to do the defendant a grave and in that proceeding an irremediable injustice. It is utterly impossible to measure the effects of such an occurrence on the minds of jurors, and consequently on the legal rights of defendant. Such unknown quantities should not enter into a case where a man is on trial for his life.

*Sixth.* Another point was reserved during the closing speech by the State. It is this: State's counsel said to the jury: "Counsel for the defendant tell you that you must not disbelieve the defendant (as a witness) because he is the defendant. Gentlemen, this is not the law." At this point defendant objected and excepted. The court remarked: "The jury will be charged that the defendant stands as any other witness whose credibility is to be judged of by the jury." The State's attorney proceeded, saying: "There will be weeping and wailing and gnashing of teeth, gentlemen, in this country whenever the day shall come when a defendant as a witness for himself, swearing for his life and liberty, shall stand on the same basis as an honorable, unimpeached witness." Exception taken and allowed.

Language is simply impotent to express a conservative view of such a scene in the court house, and we will not attempt the impossible task, but submit it to the court for review.

[Here a summary of the evidence is set forth in the brief. For the evidence see statement of the case.—REPORTER.]

*Eighth.* Defendant to cure the errors and omissions in the charge in chief tendered the following special instructions to be given to the jury, but were refused by the court:

1. While the law does not permit one party to provoke by insulting words, or words that apparently are insulting, a contest or quarrel with another with the purpose of taking advantage of the quarrel to kill or seriously injure or bodily injure in any way his adversary, yet there are rules of law which, applied to varied facts, govern them, and some of them are these: (1) The intention with which the words are uttered (as evidenced by surrounding circumstances) is always to be considered by the jury, and of which intention the jury are the exclusive judges. (2) Words apparently provoking, but which are not, under the circumstances when they are uttered, actually insulting, do not

legally constitute a provocation, and no one can take the benefit of provocation from them and thereby defeat the law of self-defense. (3) If provocation, however, is taken under the circumstances last above mentioned and a contest ensue, then if the user of the words kills his adversary he is not cut off from his right of self-defense, but is entitled to all his legal rights the same as if he had not used the words at which offense was taken. (4) If words of insult are used but not with the intention of provoking a quarrel or contest and during its continuance to kill, seriously injure, or to injure his adversary, he is not cut off from his right of self-defense, but has his rights the same as if he had not used the words. (5) For insulting words to operate so as to cut off the user of them from the right of self-defense for a killing occurring subsequently in a contest produced by the words, there must have been an intention on the part of the user of the words to then and there provoke the contest by their use, and during the contest so provoked by him to kill or seriously injure or injure in some way his adversary. If, therefore, you believe from the evidence that the defendant did use words to the deceased just prior to the killing, but that they were not insulting in fact, or that if insulting in fact were not then and there used by defendant to then and there provoke a contest with deceased and then and there in said contest to kill the deceased or to do him some serious bodily injury, or to injure him in some way bodily, then defendant is not cut off from his right to self-defense, but stands clothed in all his legal rights the same as if he had never used the words.

2. The jury are further instructed that, applying the definitions as stated in the first seven paragraphs of the court's charge and the law as given in the whole charge, and such special charge as I give you to the facts proved before you, if you shall believe from all the evidence as applied to the whole law given you in the charge beyond a reasonable doubt that defendant did, in Zapata County, on or about the 17th day of February, 1889, kill said Alejandro Vidaurri by shooting him with a pistol in the manner and under the circumstances as alleged in the indictment, you will find him guilty of murder; and if you believe from the evidence beyond a reasonable doubt as applied to the law as given in charge to you that said murder was with express malice as defined in the fifth paragraph of the court's charge, you will then find defendant guilty of murder in the first degree and assess his punishment at death or at confinement in the penitentiary for life. If, however, applying the facts as proved to the law as given you in charge, you have a reasonable doubt as to the homicide being murder in the first degree, you will acquit defendant of murder in the first degree, and then consider whether said homicide is murder in the second degree; and you are further instructed that if you believe beyond a reasonable doubt from all the evidence before you as applied to the definition

of implied malice as defined in the seventh paragraph of the court's charge and as applied to the whole law as given you in charge, that said homicide is murder in the second degree, you will so find and assess his punishment at confinement in the penitentiary for any number of years not less than five. If, however, you have a reasonable doubt as to said homicide being murder in the second degree, you will acquit defendant of that degree of murder and then consider whether or not said homicide was manslaughter; and in this connection you are instructed that if you believe beyond a reasonable doubt from all the evidence before you as applied to the definitions of manslaughter as defined in the fourteenth, fifteenth, and sixteenth paragraphs of the court's charge, and as applied to the whole law as given you in charge, that said homicide is manslaughter, then you will find defendant guilty of manslaughter and assess his punishment at confinement in the penitentiary not less than two years and not more than five years. If, however, you have a reasonable doubt as to said homicide being manslaughter, you will find defendant not guilty.

3. If the jury believe from the evidence that defendant was an employe of Antonio Bruni, and that he was on the premises of his employer and was summoned by the custom house guard to aid in the seizure of what was supposed to be smuggled animals, then in law he was in a place he had the right to be, and his act in aiding to seize the supposed smuggled animals, if he did so aid, was a legal act, although the act may have been in apparent hostility to deceased, and would not of itself evidence ill will, hatred, or malice.

4. If the jury believe from the evidence that the defendant was an employe of Antonio Bruni, and he was on the premises of his employer and was summoned by the custom house guard to aid in the seizure of what was supposed to be smuggled animals, then in law he was in a place he had the legal right to be, and his act in aiding to seize the supposed smuggled animals, if he did so aid, was a legal act, although the act may have been in apparent hostility to deceased, and in your consideration of this case after your retirement you will bear in mind the above rule of law.

5. That if the jury believe from the evidence that the defendant just prior to the alleged killing used words of provocation to deceased, but in using them did not by their use intend then and there to provoke a difficulty with the deceased and in the difficulty so provoked take the life of deceased or to do him some serious bodily harm, or then and there to do him some bodily harm, but notwithstanding a difficulty did arise between defendant and deceased, and defendant to save his own life or to save himself from being done serious bodily harm by deceased killed deceased, then the defendant is not by law denied his full right of self-defense, and if you believe as above then you will accord to de-

fendant his full right of self-defense the same as if no provoking words had been spoken by the defendant in the first instance.

6. If the jury believe from the evidence that prior to or at the time of the alleged killing there had been or was ill blood or anger between defendant and deceased, yet if you further believe from the evidence that at the time the deceased attempted to draw a weapon or made a demonstration as if to draw a firearm with the intent or apparent intent to shoot defendant, then defendant had a full right to defend himself even to the extent of taking the life of deceased, provided defendant had not then and there provoked the difficulty with the apparent intention or purpose that during its continuance he would kill the deceased or do him some serious bodily harm, and killing under the recited circumstances would not be imputed to the former or existing ill will or anger, but will take its character from the facts which arose at the time of the alleged killing.

7. The jury is instructed that the simple commencement of a conversation by defendant with deceased on the day and immediately preceding the killing is not of itself evidence of a wrongful act on the part of the defendant, nor is the commencement of such conversation sufficient to authorize you to say that the defendant provoked the difficulty with the deceased, unless you believe from the evidence in the case that defendant commenced said conversation with a wrongful purpose and with the intent to bring on a difficulty. If, therefore, you believe from the evidence that the defendant did commence a conversation with the deceased just prior to the killing, but that said conversation was not commenced by defendant for the purpose or with the intention to provoke a difficulty or contest in which he would kill deceased or do him some serious bodily injury, or injure him in some way bodily, then defendant is not cut off from his right of self-defense, but stands clothed with all his legal rights the same as if he had never commenced said conversation.

8. If you believe from the evidence that deceased made serious threats to take the life of the defendant or to do him some serious bodily harm, and you further believe from the evidence that the deceased was a man who would likely carry serious threats made by him into execution, and if you further believe from the evidence that at the time and place of the alleged killing, viewed from the standpoint of defendant, the deceased by words then uttered, by acts then done, or demonstrations then made, coupled with his character, defendant had reasonable ground to believe and did in fact then and there believe that the deceased was then and there about to carry his said threats against defendant into execution, then it makes no difference whether deceased was armed or not, for under such facts and circumstances, if you believe they existed at the time, the defendant had the legal right to then and there defend himself, and without the necessity of retreating to

avoid the fight, to the extent of taking the life of deceased, and if you believe the said facts to be true from the evidence, or if you have a reasonable doubt from all the evidence of the existence of such facts, you will acquit the defendant.

9.    If the jury believe from the evidence that the deceased had made serious threats to take the life of the defendant and that defendant heard the threats, or that they were communicated to defendant prior to the alleged killing, and if the jury further believe that defendant did kill the deceased as charged in the indictment, and believe further from the evidence that at the time of the fatal shot the deceased was in the act of carrying his threats (if he made any) into execution, or if he at the time made any movement or demonstration that was reasonably calculated to make the impression on an ordinarily prudent man that he was about to carry his threats (if he made any) into execution, or made any movements or demonstrations which in their nature were calculated to make an impression on an ordinary mind that he was about to carry the threats into execution, then defendant had the right to stand and defend himself and if necessary to take the life of the assailant, and you will acquit him, because under such circumstances he would be guilty of no degree of culpable homicide.

10.    If from the evidence the jury believe that prior to the alleged killing defendant used insulting words toward deceased of a nature to provoke a difficulty, and a difficulty was provoked between them by such language, they are instructed that such conduct on the part of the defendant is not of itself sufficient to defeat his right of self-defense, if they further find from the evidence that at the time the defendant was acting in an official character or in the interest of his employer, provided such language was used in connection with an inquiry then pending between the defendant, deceased, and others about a duty defendant owed, and such inquiry was being made by the defendant in the actual discharge of his duty as an officer of the government alone or associated with others.

11.    If you believe from the evidence before you that prior to the time of the alleged killing as charged in the indictment that the deceased had made serious threats to kill defendant or to do him some serious bodily harm, and that such threats had been communicated to defendant prior to the alleged killing, and if you further believe from the evidence that deceased was a man who would likely carry out threats seriously made by him, then if you believe from the evidence that at the time of the alleged killing, viewed from the standpoint of the defendant, the deceased by words then used, by acts then done, or demonstrations then made, coupled with the character of deceased, the defendant had reasonable ground to believe that the deceased was then about to carry his threats into execution against defendant, then the defendant had the right then and there to defend himself, and without

the necessity of retreating, to the extent of taking the life of deceased, and if you so believe the facts to be from the evidence, or if you have a reasonable doubt from all the evidence of the existence of such facts, you will acquit the defendant.

12.   Where a party provokes a quarrel or contest with another, and in its progress the one who provoked it kills his adversary, then the intention with which the act or words of provocation are said and done or uttered governs the character of the killing, and if culpable governs the degree of culpability.  To illustrate:   (1) The intention with which the contest or quarrel is provoked governs the degree of culpability of the homicide committed during its continuance by the provoker.   (2) If the provocation or the supposed provocation consists of words only, not of themselves reasonably sufficient to provoke anger and a contest, then if offense be needlessly taken and a difficulty ensue, then the user of the words is clothed with the full rights of self-defense and he may defend himself with all his rights unimpaired.   (3) If the provocation be given by words but the user of the words has the right to use them, such as an inquiry about property to its waste or injury, or its theft, or the trespassing upon it, then such words although otherwise provoking lose their provoking character when used by the owner of the property or by one who is charged directly or indirectly with its care, keeping, custody, or safety.   In such a case as that the one of whom the inquiry is made, if made in good faith, has no legal right to become angry and do violence on the inquirer, putting him on the defensive and thereby deprive him of his rights of self-defense.   In all such cases both parties stand in law on their respective rights the same as if no words had been used.

*Ninth.*   It is believed that the fact that on a former appeal in this case the judgment was reversed, among other things upon errors committed in the charge given to the jury upon the first trial, justifies the presentation of the errors in the charge given on the second under special sub-assignments of error, in order that they may be considered in close connection and in view of the state of case on which this charge was given.   And this course is adopted the more readily upon the earnest conviction that upon correct instructions given to the jury the whole law applicable to the issues of the case, clearly, correctly, and affirmatively, without confusion, contradiction, or prolix obscurity, the verdict of the jury would have been different, and that upon another trial with such proper instruction the ends of justice will be subserved instead of being perverted.

[The numbers of the special instructions referred to are as in their order in the transcript.]

Subassignment 1.—The court erred and misdirected the jury in giving to them the fourth paragraph of its main charge, in words as follows:   "Malice in its legal sense means a wicked intention to do a

wrongful act or injury to another from personal gratification or motives of revenge, without legal justification or excuse."

First proposition under this assignment.—Malice in its legal sense denotes a wrongful act done intentionally without just cause or excuse, and is to be understood as meaning that the fact has been attended with such circumstances as are the ordinary symptoms of a wicked and malignant spirit, the existence of which condition is to be inferred from acts done or words spoken; and paragraph 4 of the main charge falls far short of this. It defines it to be "a wicked intention," without informing the jury by what means or how such "intention" is to be ascertained, or from what it may be inferred; and the special instruction number 10 refused by the court was sufficient to call attention to the fact of such defects, and to require a proper explanation of malice aforethought to be given to the jury, and the failure to do so is fundamental error. Authorities: Lander v. The State, 12 Texas, 462; Harris v. The State, 8 Texas Ct. App., 109, 110; McKinney v. The State, 8 Texas Ct. App., 643; Bramlette v. The State, 21 Texas Ct. App., 619; McCoy v. The State, 25 Texas, 33; Tooney v. The State, 5 Texas Ct. App., 189; Hayes v. The State, 14 Texas Ct. App., 331; Garza v. The State, 11 Texas Ct. App., 345; Holmes v. The State, 11 Texas Ct. App., 223; Babb v. The State, 12 Texas Ct. App., 491; Caruthers v. The State, 13 Texas Ct. App., 339; Willson's Crim. Forms, Nos. 708, 709, p. 332.

Second proposition under this assignment.—The definition given in paragraph 4 of the main charge utterly fails to direct the mind of the jury to the vital point that the malice is to be "inferred from acts committed and words spoken," or that it "means the intentional doing of a wrongful act toward another," as required by all approved precedents, and it is a failure to instruct the jury as to the whole law defining malice; and the exceptions to the charge because it "does not correctly and plainly inform the jury of the law of the case as applicable to the facts in evidence," brings such failure to charge the law of the case within the statutory provision requiring a reversal. Willson's Crim. Stats., sec. 2363.

Argument under these two propositions.—The jury being left without anything to guide them in ascertaining whether such "wicked intention" existed, and being told in a subsequent paragraph of the main charge that the defendant should have resorted to "all other means" to prevent being injured before he could strike in his own defense, they might well have considered a failure on appellant's part to show that he did resort to such means was sufficient ground on which to infer a "wicked intention." They were left in the broad sea of conjecture with this resort to "all other means" rising up in paragraph 9 of the charge, like a great promontory, as the only visible object to guide their minds to a solution of the question whether there was such "wicked intention."

In Harris v. The State this court said : "About as clear, comprehensive, and correct definition as the authorities offer is, that "malice is a condition of the mind which shows a heart regardless of social duty and fatally bent on mischief, the existence of which is inferred from acts committed or words spoken." (8 Texas Court of Appeals, 109, 110.) And the words objected to then were, that "malice is the willful doing of an injurious act toward the person of another without lawful excuse;" and these words were in connection with a fairly plain explanation of how its actual existence can be ascertained. Id., 100, 101.

In McKinney v. The State the words of the charge approved by this court were, "malice in its legal sense means the intentional doing of a wrongful act toward another without legal justification or excuse." 8 Texas Ct. App., 643.

In Hayes v. The State this court reafirmed the definition in Harris v. The State, *supra,* still adhering to the form instructing as to how the existence of malice aforethought is to be inferred. 14 Texas Ct. App., 331, 332.

Again this definition is reaffirmed in Bramlette v. The State by direct reference to Willson's Criminal Forms, No. 708, page 332. 21 Texas Ct. App., 619.

It is respectfully submitted that if there ever was a case demanding a full, clear, and pertinent explanation of how malice is to be inferred, the case at bar is the one.

Subassignment 2.—The court erred in giving to the jury paragraph 5 of the general charge.

First proposition under this assignment.—The definition of express malice given in paragraph 5 of the main charge does not embrace the requisites of such a definition, in that it fails to state how such formed design is evidenced. Authorities: Jordan v. The State, 10 Texas, 479; McCoy v. The State, 25 Texas, 33; Farrer v. The State, 42 Texas, 271; Cox v. The State, 5 Texas Ct. App., 499; Sharpe v. The State, 17 Texas Ct. App., 499; Willson's Crim. Forms, No. 710, p. 332.

Argument under this proposition.—The jury are left without a guide to direct their minds to the means of ascertaining whether the killing was with express malice. The important questions are: Do the external facts and circumstances at the time of the killing, before or after that time, having connection with or relative to it, furnish satisfactory evidence of the existence of a sedate, deliberate mind on the part of the person killing at the time he does the act? Do they show a formed design to take the life of the person slain or do him some serious bodily harm which in its necessary or probable consequences may end in his death, or such general reckless disregard of human life as necessarily includes a formed design against the life of the person slain? Then why exclude from the definition given to the jury the important part

thereof, to-wit:  "Which formed design is evidenced by external circumstances discovering that inward intention, as lying in wait, antecedent menaces, former grudges, and concerted schemes to do him some bodily harm, or any other circumstances showing such sedate and deliberate mind and formed design unlawfully to kill?"   Why attempt a novelty instead of following the established precedent so familiar to the legal mind?   Why pretend to follow the definition given by Blackstone and repeated by this court in the case of Cox (5 Texas Court of Appeals, 499), without the words, "which formed design is evidenced by external circumstances discovering that inward intent?"

Subassignment 3.—The court erred in giving to the jury paragraph 6 of the main charge.

First proposition under this assignment.—The existence of express malice is never presumed from the mere act of killing another with a deadly weapon, by its intentional and deliberate use against the person killed, and the use of the word "alone" changes the meaning of the sentence, while the balance of this paragraph 6 fails to inform the jury that "there must be the other element of murder, to-wit, a cool and sedate mind and a killing in pursuance of a formed design to kill or to inflict some serious bodily injury which would probably result in death," and neither it nor paragraph 5, to which it refers, gives the jury any idea how the actual existence of express malice is manifested. Authorities: Summers v. The State, 5 Texas Ct. App., 366; Hamby v. The State, 36 Texas, 523; Richarte v. The State, 5 Texas Ct. App., 362, 363; McCoy v. The State, 25 Texas, 33; Gomez v. The State, 15 Texas Ct. App., 329, 330; Holden v. The State, 1 Texas Ct. App., 238; Murray v. The State, 1 Texas Ct. App., 421–423; Jones v. The State, 3 Texas Ct. App., 155; Farrer v. The State, 42 Texas, 266.

Argument.—A circumstance evidencing malice is expressed in Gomez v. The State; it is "the absence of any obvious or known cause to disturb his mind or arouse his passions;" and in the case at bar the mere calling the attention of the jury to such circumstance would have cleared away the difficulty about murder in the first degree. An obvious known cause to disturb appellant's mind and to arouse his passions stood out in bold relief in the facts.

Subassignment 4.—The court erred and misdirected the jury in giving to them paragraph 7 of its main charge, and in failing to give them in charge the correct definition of implied malice.

First proposition under this assignment.—Paragraph 7 of the main charge is a departure from the correct law defining implied malice, as well as from established precedent, and substitutes "intentionally" for "unlawfully," and by the use of the words, "malice is implied when it satisfactorily appears that a homicide was intentionally committed," etc., it changes the phraseology into a different form from that estab-

lished by approved precedent and conveys a different meaning to the mind of the jury, and is calculated to confuse their minds; and being duly excepted to it is error for which the judgment should be reversed. Authorities: Willson's Crim. Stats., sec. 1038, p. 205, and cases there cited; Willson's Crim. Forms, No. 711, p. 333.

Argument under this proposition.—We understand the correct rule to be as follows: "Implied malice is that which the law infers from or imputes to certain acts. Thus when the fact of an unlawful killing is established, and there are no circumstances in evidence which tend to establish the existence of express malice nor which tend to mitigate, excuse, or justify the act, then the law implies malice and the homicide is murder in the second degree."

By the change in the phraseology paragraph 7 fails to convey to the jury the sense of the words, "when the fact of an unlawful killing is established," and by the introduction in lieu thereof of the words, "when it satisfactorily appears that a homicide was intentionally committed," a different meaning is conveyed. And it will be readily seen that the phrase, "and there are no circumstances in evidence which tend to establish the existence of express malice, nor which tend to mitigate, excuse, or justify the act," conveys a different meaning, and affirmatively requires a different investigation or inquiry from that conveyed and required by this paragraph 7, and directs the mind at once to the proper inquiry, to-wit, whether there is a single circumstance in evidence "which tends to mitigate, excuse, or justify the act." But the negative form introduced by the words "neither" and "nor" in this paragraph 7 diverts the minds of the jury from the proper inquiry, and indeed such negative form violates one of appellant's most important rights, that of having the law applicable to the issue whether there were any circumstances tending to mitigate, etc., given to the jury affirmatively. If they were affirmatively charged to inquire as to whether there was any such circumstance in evidence—any circumstance having such tendency—the investigation required would be quite different, and it would at once have changed the degree found into manslaughter. For the peculiar wording of paragraph 7 obscured if it did not ignore the most vital inquiry, the failure to make which left the impression of murder in the first degree, under the other errors in paragraphs 4, 5, 6, 8, 9, and 10 of the main charge, pointed out in these subassignments.

Subassignment 5.—The court erred and misdirected the jury in giving to them paragraph 8 of its main charge.

First proposition under this assignment.—Paragraph 8 of the main charge does not correctly state the law applicable to murder in either degree. It confines the reasonable doubt in the first place to the fact of killing, requiring a conviction of murder upon the state of case it puts without requiring malice aforethought, implied or express, or

stating how the latter is evidenced or from what inferred, but referring to paragraph 5 of the charge, which is tainted with like defects; and in the second place assumes it was murder, applying the reasonable doubt to the degrees of such murder only, and in the last place again assumes it to be murder, and in a novel and erroneous manner instructs as to whether "such murder" is of the second degree, referring to paragraph 7 of the charge, which is also defective, for a definition of this degree; and as a whole this paragraph 8 is so disconnected from other parts of the charge and so worded as to confuse the minds of the jury and mislead them to appellant's injury, and cause them to convict him on a state of case insufficient in fact and in law to authorize or support such conviction; and this paragraph 8 of the charge was duly and specially excepted to.

Second proposition under this assignment.—This paragraph 8 of the charge, as well as paragraph 7 referred to therein, utterly fails to give the correct law applicable to express malice or to inform the jury how it is evidenced or from what it may be inferred, and the first subdivision of paragraph 9 requiring a resort to "all other means" before allowing the right of self-defense, the jury may have considered a failure to resort to "all other means" sufficient evidence to show express malice, and thereupon returned their verdict convicting appellant of murder in the first degree.

Third proposition under this assignment.—The introductory of the main charge instructs as to the charge in the indictment stating that appellant "stands indicted for the murder of Alejandro Vidaurri, charged to have been committed in Zapata County, Texas, on or about the 17th day of February, A. D. 1889, by shooting him with a pistol," and this paragraph 8 instructs the jury in effect that if they believe beyond a reasonable doubt that appellant "did kill Alejandro Vidaurri by shooting him with a pistol in the manner and under the circumstances alleged in the indictment" they "will find him guilty of murder and the degree of such murder," and makes the mere fact of killing by shooting with a pistol sufficient to constitute murder.

Subassignment 6.—The court erred and misdirected the jury in giving to them the first and second subdivisions of paragraph 9 of the main charge.

First proposition under this assignment.—If there is "a reasonable expectation or fear of death at the hands of another who is making an unlawful or violent attack upon" the defendant, "it is a reasonable expectation or fear of murder," and the party so assailed has a right to kill upon such reasonable appearance without resorting to any other means, and a charge on the law of self-defense given to meet the issue raised by the testimony can not lawfully require of him to resort to any means to avoid the conflict, and to instruct the jury "that in such case all other means must be resorted to for the prevention of the in-

jury" is a fundamental error, and being duly excepted to is cause for a reversal of the judgment. Hunnicutt v. The State, 20 Texas Ct. App., 643–645, and authorities cited.

Second proposition under this assignment.—The evidence in this cause makes a state of case governed by article 570 of the Penal Code, and "in such cases the assailed party may lawfully kill the assailant while he is committing the offense or injury, or when he has done some act evidently showing his intent to commit it, and the assailed party need not first resort to other means of prevention; and a charge on the law of self-defense which, upon the same state of case, charges that he must resort to "all other means" (Penal Code, art. 572), and in the next subdivision that he "is not bound to retreat," is repugnant and contradictory; and the correct rule is, when contradictory charges are given, to reverse the case, and when excepted to on such ground the statute requires a reversal of the judgment. Willson's Crim. Stats., sec. 970, p. 191, and cases there cited; Railway v. Robinson, 73 Texas, 284.

Third proposition under this assignment.—There is a direct conflict between the first subdivision of paragraph 9 of the main charge and the first special instruction given at appellant's request, and the latter could not in the nature of things cure the error in the former as long as it was permitted to remain a part of the main charge. Either that portion of the main charge should have been withdrawn or the special instruction refused. Arcia v. The State, 28 Texas Ct. App., 199; Morgan v. The State, 16 Texas Ct. App., 624.

Argument under these three propositions.—There can be no doubt about the first subdivision of paragraph 9 of the main charge being intended to be applied by the jury to the issue raised by the testimony as to whether the conduct of deceased was such as to produce in appellant's mind a reasonable expectation or fear of death or of some other serious bodily injury at the hands of deceased; and it is plain that the law arising under article 574 of the Penal Code ought to have been given to the jury instead of the law arising out of article 572.

In its first part this first subdivision is an attempt to charge the language of article 572 of the Penal Code just far enough to get in the words, "in such cases all other means must be resorted to for the prevention of the injury," but in its conclusion it attempts to charge the law arising under article 574; and this is followed by the second subdivision changing article 573, though these two are independent declarations with regard to the law of self-defense to be applied to all unlawful or violent attacks producing a reasonable expectation or fear of death or serious bodily injury, to the exclusion of the words quoted just above, which should never be applied to such cases. Thus it will be observed that these two subdivisions are confused and inconsistent and well calculated to confuse the minds of the jury.

It is patent upon the face of the first subdivision of paragraph 9 of the main charge that it was intended to exclude from the jury the correct law arising upon the facts under article 570 of the Penal Code, although they should find from the evidence that the killing took place "while the killed was doing some hostile act or making some hostile demonstration that would, viewed from the standpoint of the slayer, produce in his mind a reasonable fear or expectation of death or of some serious bodily injury," and to require them upon such state of case to deny him the right of self-defense unless he had affirmatively shown that he resorted to "all other means"—retreated to the wall— "to prevent the injury," before killing the one whose violent conduct "produced in his mind" such "reasonable expectation or fear." By the omission of the word "other," used in article 572 after "any," it makes the latter, in the phrase, "from any unlawful and violent attack," equivalent to "every," so as to include all such attacks, and makes the words "in such case" equal to "in each and every case," applying the requirement that in each and every case of an unlawful and violent attack "all other means must be resorted to," while in cases like that put in paragraph 9 of the charge the law does not require a resort to any other means, and thus it ignores the rule of law applicable to the state of case under article 570 of the Penal Code.

The resort to this anomaly is a plain evasion of the requirement to give to the jury the whole of the law applicable to the case, and being duly excepted to it constitutes a statutory ground for a reversal of the judgment.

Retreat is one of the things embraced by the term "all other means," used in the first subdivision of paragraph 9 of the charge, and the jury might properly consider it one of the means appellant was required to resort to by such subdivision. And in this case the jury might find from the evidence that the impression made on appellant's mind by the conduct of the deceased was that of reasonable expectation or fear of being immediately murdered, and still deny him the right of self-defense because he had not affirmatively shown that he retreated to the wall. But retreat would have been extremely dangerous in case the deceased had a firearm and was really in the act of drawing it to shoot appellant; and this is the very kind of danger intended to be prevented by the law of self-defense, yet by this subdivision the jury were in effect charged that appellant should have resorted to such means and incurred such danger of death, and this instruction went to the jury as a charge of the court on the law of self-defense.

This first subdivision was given as applicable to the case before the court, treating it as one in which the testimony raised the issue as to whether "the killing" took "place while the person killed" was "doing some hostile act or making some hostile demonstration that would, viewed from the standpoint of the slayer, produce in his mind a rea-

sonable fear or expectation of death or of some serious bodily injury," and requires in case the jury should find the affirmative of this issue that they must further find that "in such case" the accused had resorted "to all other means" before slaying his assailant before he would be entitled to the benefit of the law of self-defense. Does it not require them to find the affirmative of both these issues before allowing such benefit? Can a conviction so procured be allowed to stand?

The rule that under such circumstances the slayer must have resorted to all other means to avoid being murdered before he could claim self-defense caused the execution of many a man who struck the fatal blow under the expectation or fear of being immediately murdered by his assailant, and it was the humane intention of our law to forever prohibit such judicial murders as well as all other grades of punishment in such cases; and the case at bar is one in which this humanity of the law should have been clearly, correctly, and affirmatively given in charge to the jury untinged by any contradictory rule. Indeed, the jury should have been told in so many words that if the acts of deceased were such as to cause in appellant's mind a reasonable expectation or fear of death or serious bodily injury, then he had a right to slay his assailant without resorting to any other means to prevent the injury, and the failure to so charge is a fundamental error embraced by article 685 of the Code of Criminal Procedure, invoked by the third paragraph of appellant's bill of exceptions number 5.

The second subdivision of paragraph 9 of the charge instructed the jury that the person "against whom such hostile act or demonstration is made is not bound to retreat" to avoid the necessity of killing his assailant. So in one subdivision they are in effect told that he is and in the other that he is not bound to retreat; and therefore it is plain that these two subdivisions, relating to the very same state of case, are contradictory and altogether irreconcilable.

By the first special instruction given at appellant's request, the jury were again told that appellant was not bound to retreat; still the objection to the main charge because it was contradictory was overruled, and the obnoxious words also contradicting this special instruction retained, as if to control the action of the jury, regardless of every effort on the part of appellant to correct the damaging error which, "in the nature of things," could not be cured as long as it was permitted to remain a part of the main charge.

It is impossible to ascertain how the jury viewed these instructions. They may have considered the first as superior to the other two, and therefore have disregarded the latter altogether. Shall their verdict found under such circumstances be permitted to stand?

Subassignment 7.—The court erred and misdirected the jury in giving to them the third subdivision of paragraph 9 of the main charge.

First proposition under this assignment.—The law only requires that it "shall reasonably appear by the acts or by words coupled with the acts of the person killed that it was the purpose and intent of such person to commit the offense;" and the requirement of the third subdivision of paragraph 9 of the main charge, that it must appear that the hostile acts or demonstrations were such as would produce in "defendant's" mind a reasonable fear or expectation of death or of some serious bodily injury, puts upon him the burden of making proof not required by the law, and was duly excepted to. Subdiv. 1, art. 570, Penal Code.

Second proposition under this assignment.—Article 570 of the Penal Code comprises all cases in which from the acts of the assailant or his words coupled therewith it reasonably appears that his purpose or intent is to murder * * * or do other serious bodily injury to the assailed party; and it is not because he feared or expected death or injury, but that the facts were such that the jury can say he had reasonable ground for such belief that justifies the person assailed in killing his assailant, and as long as the facts show that the danger, real or apparent, existed the right of self-defense continued, and by restricting this right to the fear or expectation actually produced in the mind of the defendant, the court below excluded from the jury the right to determine whether the facts were such at the time of the killing as afforded reasonable ground for such belief. Willson's Crim. Stats., sec. 970, p. 191, and cases there cited; Blake v. The State, 3 Texas Ct. App., 588; Williams v. The State, 2 Texas Ct. App., 286; Lander v. The State, 12 Texas, 462.

Third proposition under this assignment.—The latter part of subdivision 3 of paragraph 9 of the main charge again makes the whole right to kill in self-defense to depend, first, upon the fact of defendant's belief at the time, and second, upon the fact of "such fear being produced by hostile acts on the part of the deceased," making the right depend upon the actual belief and fear of defendant at the time, instead of on reasonable grounds to believe, etc.

Argument under this assignment.—In the first place, "the person attacked must decide for himself, at his peril, as to whether the circumstances in which he is placed, and upon which he acts, are such as to furnish a reasonable apprehension of danger" (Williams v. The State, 2 Texas Court of Appeals, 279), and "it is not enough that he believed himself in danger, unless the facts and circumstances were such that the jury can say he had reasonable grounds for his belief." Blake v. The State, 3 Texas Ct. App., 589. But if the facts and circumstances were really such "that the jury can say the slayer had reasonable grounds to believe" deceased intended then and there to shoot him, etc., could it possibly devolve upon defendant to prove that any particular effect was produced in his individual mind other than the ap-

prehension naturally arising upon such circumstances? If the acts and demonstrations of deceased were really such as to justify the belief that he intended to murder appellant then and there, or to inflict on him some serious bodily harm, did not the right of self-defense instantly arise thereon though the latter were perfectly cool and self-possessed?

It is respectfully submitted that the true and in this case the only test is, whether the facts and circumstances at the time were such "that the jury can say he had reasonable grounds for his belief" that deceased then and there intended to shoot him, "and it would make no difference whether the danger was real or imaginary, if it had the appearance of being real." And appellant was entitled to have this issue clearly and affirmatively presented to the jury.

Subassignment 8.—The court erred in giving to the jury subdivision 4 of paragraph 9 of the main charge.

First proposition under this assignment.—This subdivision is given in negative and alternative form, is confused, and departs from the statute, and bases the right of appellant to the benefit of the law of self-defense under threats upon the matters required by such departure and refers it to such negative and alternative state of case therein put. Miles v. The State, 18 Texas Ct. App., 171.

Proposition under this assignment.—The law upon the subject of threats is, that to justify under threats it must be shown that at the time of the homicide the person killed, by some act then done, manifested an intention to execute the threats; and nothing more is required to authorize the defendant to justify under them. And this law should have been given to the jury affirmatively.

Argument under this assignment.—It is believed that the correct charge on the law of self-defense as applicable to threats in this case would be as follows: If the jury find from the evidence that the deceased had threatened the life of the defendant, and that he at the time of the homicide, by some act then done, manifested an intention to execute the threats, then the defendant would be justifiable in killing him, and in such case you should acquit the defendant. But such threats can not be regarded as affording a justification for the offense unless it be shown that at the time of the homicide the person killed by some act then done manifested an intention to execute the threats so made.

Such an instruction was demanded by the evidence and the defendant was entitled to have it given to the jury; but the subdivision 4 of paragraph 9 of the main charge departs widely from this and from the words of the statute. It substitutes for "act then done manifesting an intention to execute the threats so made," the words, "act or was making some demonstration manifesting an intention then and there to execute or carry out such threats, or which was reasonably calculated

in view of all the evidence and circumstances of the case, considered from the defendant's standpoint, to produce and did produce in the mind of the defendant the belief that deceased was about to execute such threats." It follows this departure from the law with, "and in that event defendant would have the right to act upon such reasonable appearance of danger." In what event does it mean? Is it in the event of such impression being produced in defendant's mind? Does it not lead the jury off from "act done at the time manifesting an intention to execute the threats so made" to an inquiry as to the state of defendant's mind produced by such demonstration, and as to whether this showed "that deceased was about to execute such threats?" What is to be understood from the term "about" in this connection? Does it mean "an intention?" Does it not mean near to, just in the act of, in a state of readiness, or almost? Can such a departure from the words of the statute be sustained on the line of decisions on the subject? Is not this departure greater than the one condemned in Miles v. The State, 18 Texas Court of Appeals, 171? Are not these defects and errors pointed out by paragraph 9 of appellant's bill of exceptions number 5 so as to invoke the statutory rule and under it necessitate a reversal?

Subassignment 9.—The court erred in giving to the jury paragraph 9 of its main charge as a whole on the law of self-defense.

First proposition under this assignment.—This paragraph 9 is confused, contradictory, and makes the right of self-defense stated in the third and fourth subdivisions thereof subject to the conditions named in its first subdivision, that defendant must have resorted to "all other means to prevent the injury" before slaying his assailant, and unless this fact is shown excludes his being allowed such shield. See authorities cited under the sixth, seventh, and eighth sub-assignments of error.

Argument.—An examination of the charge on self-defense will readily show that it is confused throughout its several parts, and is not only a failure to charge the correct law applicable to the issue, but a prolix effort to evade the use of well established precedents. Blake v. The State, 3 Texas Ct. App., 588.

Subassignment 10.—The court erred and misdirected the jury in giving to them paragraphs 10 and 11 of the main charge, and in refusing to give them special instructions numbers 2, 4, 5, 13, 15, and 18.

First proposition under this assignment.—It is the duty of the trial judge to measure his charge by the evidence adduced and give instructions to the jury as to every legitimate deduction to be drawn therefrom, and the charge must be tested by the evidence. It must contain the law and all the law applicable to every issue legitimately raised by the evidence. It must make a pertinent application of the law arising out of the evidence, no matter how weak and impotent the evidence

may appear to the court. ' And the facts in this case abundantly show-
ing that though defendant may have spoken the first word in the wordy
altercation, there is nothing to show that he did so with any intention
to provoke a conflict and during its progress to kill or inflict serious
bodily injury on deceased, and the facts showing that the act was done
suddenly and without deliberation, the issue is clearly raised as to
whether these facts show a state of case depriving appellant of his
right of self-defense, and the law arising on this state of case should
have been pertinently applied to the issue, and the failure to do so is
fundamental error.   Smith v. The State, 15 Texas Ct. App., 149; Burk-
hard v. The State, 18 Texas Ct. App., 619; McConnell v. The State, 22
Texas Ct. App., 372; Liskosski v. The State, 23 Texas Ct. App., 169;
Green v. The State, 12 Texas Ct. App., 445; King v. The State, 13
Texas Ct. App., 280, *et seq.;* Smith v. The State, 15 Texas Ct. App.,
346, *et seq.*

Second proposition·under this assignment.—The defect in paragraph
10 of the main charge is not cured by any other paragraph thereof, but
is rendered even more impotent by comparing it with special instruc-
tions on the same subject asked by defendant and refused by the court.
Authorities:   Those cited under next preceding proposition.

Argument.—The rule in Liskosski v. The State, 23 Texas Court of
Appeals, 169, applies here with much force; and that in Smith v. The
State may be here invoked with equal propriety (15 Texas Court of
Appeals, 346, *et seq.*), and attention is called to it as a conclusion of
this argument.

Subassignment 11.— The court erred and misdirected the jury in
giving to them paragraphs 12, 13, 14, 15, 16, 17, 18, 19 of the main
charge as the law applicable to the issues of manslaughter, and in re-
fusing to give them special instruction number 6 asked by appellant.

First proposition under this assignment.—Paragraph 18 of the main
charge presents a state of case which would call for a charge on self-
defense when coupled with the other facts, and then attempts to apply
to it the law of manslaughter, while paragraph 19, in close connection
therewith, states fully and clearly a state of case authorizing self-de-
fense and still applies to it the law of manslaughter, and these two
paragraphs when considered in connection with paragraphs 9 and 10
completely cut off defendant's right of self-defense.

Conclusion.—In the event of a reversal of the case, it is particularly
desired that the court will express itself on the points embraced in the
several bills of exception.   Unless the court does so express itself, this
case in our opinion will return for review time and again until each
point is reviewed by separate appeals.   The desire to have such rul-
ings has caused us to make this elaborate brief.

It is our candid belief that we could have selected as many as six or
even ten reversible errors and have rested the case on any one of them

and have secured a prompt reversal, but there should be an end to er-
rors and the imprisonment of this man because of them.    Therefore it
is we ask the court to settle the law on all the points brought up.

*R. H. Harrison*, Assistant Attorney-General, for the State.
There is no brief for the State with the record.

*W M. Walton*, for appellant, on motion for a rehearing submitted
the following brief.—I exceedingly regret that I have not the oppor-
tunity to orally argue this motion.

My confidence was too great in what I believed unquestionable
errors occurring on the trial below.    If my own life had depended on
the issue I should, as a lawyer, have believed and said that the errors
were patent and would necessarily work a reversal of the case.    My
opinion has undergone no change, because I do not think the points
made have been logically overthrown.

Of course it is no unusual matter for any man, any lawyer, and so
far as that is concerned, any judge or any court, to fall into grave and
sometimes fatal error.    It is not a safe thing for any one to become
absolutely wedded to his opinion or to rely with absolute confidence in
the correctness of his own convictions.    The overruled cases in all
courts—the same court composed of the same members overruling
themselves—testify in a warning voice that caution, patience, and a
nicely weighing of law and fact should attend the investigation of
every case, and especially so where a man's liberty for life is depend-
ing.    In this court itself there have been over fifty cases overruled,
some of them being for severe penalties.    So I trust that I am in no
way out of order in appealing to the court in the most earnest manner
of which I am capable to give the maturest consideration to the points
I make, for I speak from as thorough conviction as ever authorized,
justified, or moved a man to reason with individuals or courts.

That Gonzalez has been unlawfully convicted and now rests in prison
there is no shadow of doubt in my mind.    No man yields more readily
and unconditionally than I do when my judgment is convinced, nor
am I often all blinded to the merits of the side of the case against me.
Though often overruled by this court when I believed I was right, I
have never doubted the honesty, uprightness, or purity of any member
now on the bench or who has sat upon it, but I can assure you the
blows have sometimes been about all I could stand up before and re-
tain any decent respect for my own acquirements from study or prac-
tice as a lawyer.    But it is not unfrequently that you differ on the law
among yourselves, and at times unanimously conclude you have been
all wrong, take back your enunciations as to what the law was or is,
and announce quite a different rule.    We are but men at best, with all

the shortsightedness and defects common to the frailties of our human natures.

Although I am denied the privilege to speak to this motion orally, I trust, hope, and believe that my written words, if they have truth, force, or weight in them, will be given their proper and rightful effect.

The judge who delivered the opinion surely misapprehended or did not thoroughly grasp the exact fact in the record in regard to the exceptions taken to the charge in chief of the trial court. His statement is wholly at variance with my reading of the record, and I know it is wholly at variance with the facts as they occurred in court. The facts were that after the charge was drafted it was handed to me, and I carefully, deliberately, and fully made elaborate notes of my objections and delivered them to the court for his information and guidance in the event that he should see proper to in any extent modify the principles of law announced by him.

And the record shows that the exceptions were taken in open court and before the jury retired. There is no virtue in taking exceptions in open court and before the retirement of the jury, save only to notify the judge that counsel challenges the correctness of his propositions of law, so as to enable him to review his expressions and modify them if he deems it proper to do so.

I take it that there will be no controversy "that the exceptions were taken at the proper time to convey to the court the fact that his charge was challenged—not as a whole, for that exception will not be considered—because it did not convey to the mind of the court what special, particular, or identified expression, rule, or utterance was excepted to, but to specific, pointed-out, recited, and identified parts. It was conceded that it was necessary to put the finger, as it were, on the very error, unless the error be fundamental; then it need not be pointed out either in a general or particular way. Then after the general exception, particular and specific exceptions were taken to particular and specific parts of the charge. The record bears me out in this statement.

The charge of the court, subdivision 1 of paragraph 9, was specially excepted to—the attention of the court called to it in writing before the jury retired and in open court. It was excepted to because it required of the defendant when attacked to resort to all other means before taking life. This expression is not the law on the facts in the case. What does it mean when applied to the facts in evidence?

Is it true in this State that where a person is attacked and his life endangered, seriously threatened, or where he is in danger of serious bodily injury, that he must resort to all other means before he is authorized to take the life of his assailant? Is this court willing to submit such a proposition as law—and to uphold it as law in a murder case—to the bar of Texas and to the mind of the legal world? To what

other means could appellant have resorted in the supreme moment when his own life depended upon his own quickness and efficiency of action? I repeat it, to what could he have resorted? Can the most fruitful and ingenious mind answer the question? He could have retreated, but the law is express that he is not required to retreat. Such has been the uniform holding of the court. The Assistant Attorney-General did not try to meet and answer the exception, nor does the opinion pretend to do so. There is no answer to it. No man when personally attacked is required by law, reason, or common sense to resort to any means save to stand and defend himself. The exception comes front face to the court and demands that it receive the treatment its merits demand. If, as in Horbach, and in this and other reputable courts, hundreds of cases, before and after it was decided, clothes the man in the right to take life when a hostile movement is made, although the maker of the movement may be actually unarmed, how can it be that Horbach was required to resort to all other means before taking life? No, if the court please, self-defense does not rest on so precarious a basis as Gonzalez is made to stand on in the opinion affirming his case.

What did the jury understand—what could jurors understand the court meant by the challenged part of the charge—that Gonzalez should do? Resort to all other means? What other means? But he had to do so or under the charge of the court stand guilty, and the jury so find him. There is no other interpretation to be given. There is no other action the jury could take if they obeyed the charge of the court but convict, for Gonzalez did not resort to all other means. I venture the assertion, if the court please, that this charge of the court has no parallel in the judicial history of Texas. That is to say, that no court has ever charged on pure personal self-defense that such defender should resort to all other means to prevent taking life before he could resort to defensive measures. The proposition, in the presence of the law of personal self-defense in Texas, strikes a blow at and uproots the whole principle of personal self-defense, and can be considered, contemplated, or entertained only with fear and alarm. Let such rule prevail and no assaulted man can defend himself until after he has resorted to all other means to prevent his assailant from killing—yes, murdering him, or doing maim or serious bodily harm to him.

The sections of the statute, 570, 571, and 572, which were confused by the court to the fatal injury of appellant, were intended to apply to wholly different states of fact, otherwise they are irreconcilably in conflict, and the duty of the court would be to reconcile them or else enforce part and let the others grow obsolete. They can not exist and be enforced on the same state of facts. It is no question for the court to determine here as to whether the killing was a "deliberate and un-

provoked murder;" that was a question for the jury under a proper delivery of the law of the case on the trial. If the law was distorted, bent, or confused, and an exception taken as required by the law and practice, then it makes no difference what the facts are or were, the case is to be reversed if the law is enforced.

The bill of exceptions recites: "To which said charge (judge's charge) of the court, in open court and before the jury retired, defendant excepted, and now here specifies parts and portions of said charge as objectionable and as not applicable to the issues," etc. Then follows the specific exceptions to the specific part of the charge which requires defendant to resort to "all other means" to prevent the threatened injury before taking life. So the exception was taken in proper shape.

Article 570 provides. "Homicide is permitted by law when inflicted for the purpose of preventing murder." Article 569: "But it must reasonably appear by the acts or by words coupled with the acts of the person killed, that it was the purpose and intent to commit the offense of murder." Article 570, subdivision 1: "Homicide is permitted in the necessary defense of the person, but coupled with the conditions above." Article 569 gives the right of self-defense in protecting the person of the slayer, but one or more of the conditions mentioned in the subdivision of article 570 must accompany the killing. Article 572 provides protection when a killing ensues which is not covered by the nine conditions of article 570; the law expressly so provides. If any of the nine conditions of article 570 be present when a killing is done, then the slayer is not required to "resort to all other means" to avoid taking life.

All the law applicable to the facts in evidence must be given whether asked or not, no matter how weak or improbable the testimony may be. Pure self-defense is present here. Stewart's case, 15 Texas Ct. App., 598; Willson's Crim. Stats., sec. 2335.

Must be applicable to and limited by the evidence: Johnson's case, 13 Texas Ct. App., 378; Willson's Crim. Stats., sec. 2337.

Self-defense under article 570: Cartwright's case, 16 Texas Ct. App., 473; Williams' case, 22 Texas Ct. App., 497; Hunnicutt's case, 20 Texas Ct. App., 632; Willson's Crim. Stats., sec. 970.

Self-defense under article 572: Kendall's case, 8 Texas Ct. App., 569; Weaver's case, 19 Texas Ct. App., 547; Willson's Crim. Stats., sec. 973.

The danger may be only apparent: Cartwright's case, *supra;* Willson's Crim. Stats., sec. 978.

Provoking difficulty: On this point there is a total lack in charging the law of the case. If Gonzalez did not provoke the difficulty, then full self-defense existed. If he did provoke, then the intention with

which he provoked it was not only material but vital to reach the degree of guilt. Cartwright's case, *supra;* Willson's Crim. Stats., sec. 981.

On the above point the court not only failed to charge himself, but refused a proper charge when prepared and presented to him.

The witness Garza in his personal presence was very necessary to defendant. He was but temporarily absent from the State. To enable defendant to take his deposition he (witness) must have removed from the State. Willson's Crim. Stats., art. 760; Conner's case, 23 Texas Ct. App., 378; Golden's case, 22 Texas Ct. App., 1.

The witness had been subpœnaed and testified at the former trial. His testimony was not cumulative; it was material—additional; and on the main issues—casual meeting, sudden killing, self-defense—vital. If the court will carefully read his testimony there will be no room to doubt that it was not cumulative and that it was of the utmost importance. We could not reach him with process. We were not entitled to process unless by special order of the court. Gen. Laws, 1889, p. 145. What could defendant do? The witness left the State when the former appeal was pending.

The omission to properly define malice in a murder case is a fundamental error that will be corrected at any time by action of the court *ex mero motu.*

I earnestly request the court to review not only the original brief in this case by appellant, but also the entire record in connection with this brief on the motion to rehear and reverse.

I do not see how I can strengthen what I have said, and therefore submit the motion to the court.

Addenda.—I beg to call the attention of the court to Farrar's case (15 S. W. Rep., 719), where much and controlling effect is given to the questioned legal right of appellant to be at the place where the offense was committed. Garza would have sworn that Gonzalez was on the ground as a part of a *posse* summoned under the law. How essential it was to prove the absolute innocence of his presence there. Garza would have shown the legal right of appellant to be there—casual meeting, for Gonzalez had only been there a few moments when deceased came up—and self-defense. I had to use his testimony, however weakened, ineffectual, and ineffective on these vital points, weakened and adulterated by at least three removes from the evidence if delivered by himself. (1) Stenographic notes. (2) Carried into long hand. (3) Canvassed and changed by counsel and the court. (4) Read by counsel to the jury. Testimony must have indeed bristled with truth, honesty, and force to have survived such an ordeal and still have had effective force when read to the jury; and yet we brought ourselves inside the law to obtain the personal presence of the witness on the trial.

See instruction 8 asked by appellant and refused.

HURT, JUDGE.—This is an appeal from a second conviction for murder of the first degree, the punishment being fixed at confinement in the penitentiary for life.

Seven errors are assigned: (1) The overruling of an application for continuance. (2) In admitting evidence. (3) Refusing to exclude improper evidence. (4) Refusing charges asked by appellant. (5) Errors in the charge in chief. (6) Improper remarks by counsel for the State in the closing argument. (7) Because counsel for the State was permitted to reread reproduced testimony in the final argument.

This was the second application for a continuance, and if diligence is shown, still the facts desired from the absent witness were proved by other witnesses. Walker v. The State, 13 Texas Ct. App., 618.

The State proved certain facts by Mrs. Vidaurri without objection from the defendant, whereupon defendant moved to exclude certain parts of her testimony, and this motion was overruled.

We have very carefully examined the facts sought to be excluded, and when they are considered in connection with all the facts in the case we are not prepared to say that they are not competent evidence. But concede their incompetency, the questions to this witness were not so framed as to preclude objections by the defendant when the evidence was admitted, and he will not be permitted to speculate on the answers.

There is nothing in the fourth bill of exceptions.

There was a general exception to the charge of the court as a whole and exceptions pointing out supposed errors in the charge. The definition of express malice was not objected to specially. A general exception to the charge is no exception at all, and the supposed error in such state of case will be considered as if no exception to the charge had been taken. Conceding the error, the question would then be, was it such as to injure the accused when viewed in the light of the facts in this case? We are of the opinion that there was no injury to appellant from this error.

The court below gave in charge to the jury the law applicable to article 572, Penal Code, and then submitted the law applicable to article 570. In this there was no error, though the general practice is to submit the law applicable to article 570 first.

Counsel for appellant point out a great many supposed errors in the charge. We have examined this charge closely, and are of the opinion that when tested by the evidence as presented to us in the statement of facts it is a correct application of the law to all of the legitimate phases of the case. The reporter will give the charge in full.

In his closing argument counsel for the State said to the jury: "Counsel for defendant tell you that you must not disbelieve the defendant because he is the defendant. Gentlemen, this is not the law." At

this point defendant objected and excepted. The court remarked: "The jury will be charged that the defendant stands as any other witness whose credibility is to be judged of by the jury." The State's counsel proceeded, saying: "There will be weeping and wailing and gnashing of teeth in this country whenever the day shall come when a defendant as a witness for himself, swearing for his life and liberty, shall stand on the same basis as an honorable, unimpeached witness." Exceptions were taken.

It is not contended that the remarks of the judge were not heard by the jury. If they were, then the statements of the district attorney, if improper, and this is not decided, were rendered harmless, for the judge stated that the defendant stands as any other witness whose credibility is to be judged of by the jury.

We have read and reread the lengthy brief of counsel for the appellant. We have briefly noticed as we think the most important points raised, and must say that if there be reversible error in this record we have been unable to discover it. As we view the case, this was a deliberate and unprovoked murder. We reach this conclusion after a very searching examination of all the testimony tending, or which is relied upon as tending, to excuse or mitigate the homicide. We have examined the charge not in the light of the State's evidence alone, but in the light of every theory presented by any testimony which might be construed favorably for the defendant. We believe the charge taken as a whole is correct.

The judgment is affirmed.

*Affirmed.*

Davidson J., being disqualified, did not sit in this case.

## ON MOTION FOR A REHEARING.

HURT, JUDGE.—The writer has read this record carefully three times, has given it a thorough consideration, has read the motion, briefs, and arguments through in connection with the record, giving to each a searching investigation. This has been induced not only by the gravity of the charge and punishment, but also by the great confidence exhibited in the brief and argument of counsel for the appellant—counsel than whom I know none superior in this State. The argument is written "with a strong hand," and we will try to answer it.

We will not discuss the first and second grounds for rehearing, believing that they are not well taken.

The third ground, "that the special charges asked by appellant were pertinent, applicable, and material. They were refused, and the court did not in fact, effect, nor in substance cover the points made by said refused charges, yet the court say there was no error."

Concede these propositions to be true, to be sustained by the record, and there is reversible error. But is there a phase of the case made by the evidence not covered by the charge of the trial court, supplemented by that given at request of appellant? If there is, and a charge was requested applicable to such phase and it was refused, then there was reversible error.

Now, what is the case with all of its phases?

The State proved by the positive evidence of Luciano Salinas that he got down and sat under a small mesquite. After a little while deceased came up on horseback and saluted those present and asked Mr. Grimes' permission to take the stock. Grimes told Andres to tell deceased to wait until Morel came. Deceased said "all right," and remained standing. Then defendant came up in front of deceased and said to him, "Why are you branding those calves?" Deceased replied, "Because they belong to me." Defendant replied that they did not belong to deceased. Deceased then said, "That is all right; we will settle the matter at law." Defendant then said, "There is no law nor anything," and then drew out his pistol and shot deceased. At the time defendant pointed his pistol at deceased the latter was sitting on his horse with his left hand resting on the horn of his saddle and his right hand holding the reins resting on top of his left. When defendant pulled his pistol the deceased with his right hand reined his horse to one side away from defendant, and at the shot fell backward off his horse.

Deceased did not have anything in his hands when he fell. He was unarmed. When defendant pulled his pistol he struck spurs to his horse and jumped him toward deceased, and at this moment Mr. Grimes made a motion as if to stop defendant and said, "Stop! don't shoot him." At the time of the shooting all were on horseback save the witness. Only one shot was fired. Deceased did not fire. Defendant after the shooting walked with his pistol in his hand around the body of deceased. Mr. Grimes then said to Andres, "Tell him to put his pistol in his scabbard." Defendant put up his pistol and then started off and the others followed a short distance. Defendant remarked, "I am going to deceased's house to see who else is there." Grimes then said, "Tell him not to go." Deceased did not move after he was shot. After deceased fell his horse ran off. A short time after the shooting Morel and Porfirio came up and they all went off.

Though Grimes did not see the deceased at the very moment he was shot, because he was looking at the defendant, he very strongly corroborates Luciano Salinas on every material fact.

Appellant's theory of the case is developed by the testimony of Andres Garza. He says: "I was present at the killing, which took place on the 17th day of February, 1889, in Zapata County. Those present at the time were myself, Evaristo Rodriguez, Grimes, defendant, Pan-

cho Guzman, and the little boy. The little boy was brought back there by me, and at the time of the shooting was about thirty or forty steps in the brush from where the killing took place. I was about twenty-five feet from the deceased and about the same from the defendant, and defendant was about the same distance from Vidaurri. There were some small bushes where we were, but not enough to obstruct the vision. There were also some bushes between the place where we were and the horses. Defendant said to deceased, 'If you have this stock in here in good faith, why did you put them in without permission to do so?' Deceased then made some answer, and defendant said, 'There are two calves in here that belong to Mr. Bruni with your brand on them. What right had you to put your brand on them?' Deceased then replied that he would put his brand on top of Bruni's, and that if he (defendant) and Bruni would turn to cows he (deceased) would put his brand on them, too. These were the last words spoken, and then both made several movements, one to turn in one direction and the other in another, and then both made motions as if to draw arms and then the shooting took place. Both made motions at the same time. At the time deceased put his hand on his hip defendant pulled his pistol and shot. The first motion was made by deceased."

This theory is supplemented by these facts: That appellant had business at the place of the homicide and was lawfully there; that a gun was seen in the scabbard hanging to deceased's saddle; that serious threats had been made against the life of appellant by deceased and the threats had been communicated to appellant.

The case made for the State presents a deliberate and unprovoked murder. The appellant says not so; that there is reasonable doubt of this; that the homicide was justifiable or may have been because of the actions and demonstrations of the deceased at the time of the killing, viewed in the light of the threats and violent character of deceased.

There is another feature of the case for the State. To the contention of appellant the State replies, that if in fact deceased made demonstrations tending to show that he intended violence toward appellant he was provoked thereto by appellant, and that the provocation was given or the occasion produced for the purpose of obtaining a pretext to kill the deceased, and that therefore the theory of appellant will not avail.

We have stated the case with all its phases. The question arises, Did the learned judge who tried the case, in the charges given to the jury, furnish them with the proper rule of law—that applicable to each phase of the case made by the evidence?

To the State's theory the law was correctly applied, unless, as is contended by counsel for appellant, there was error in the charge relating to the evidence tending to show that appellant provoked the difficulty or produced the occasion to kill. If appellant provoked the difficulty

or produced the occasion with intent to kill his adversary and did kill him even to save his own life, he would be guilty of murder. But if the provocation was not given or the occasion produced with such intent and appellant killed to save his own life, he would not be guilty of murder. Were these rules given?

By reference to the charge it will be found to contain them. The court charged:

"If you believe, therefore, beyond a reasonable doubt that defendant by his own wrongful act brought about the necessity of killing deceased, or provoked the difficulty with the apparent intention of taking the life of the deceased, intentionally and with a view thereto, and that under such circumstances he shot and killed deceased, then defendant's plea of self-defense will not avail him, and the homicide would be murder of the first or second degree according as the facts and circumstances may justify the jury in finding. But if defendant provoked the difficulty without any intention to kill or inflict serious bodily injury, and suddenly and without deliberation did the killing under the immediate influence of sudden passion arising from an adequate cause as herein explained, while the homicide would not be justifiable, it would be manslaughter as that term is herein defined."

This charge is supplemented by that given at the request of appellant, as follows:

"If you believe from the evidence that deceased did not actually and in fact have arms on his person at the time he was shot, yet if you further believe from the evidence that at the time the shot was fired deceased had made or was in the act of making a movement as if to draw a firearm, and if from that movement the impression was made on the mind of defendant that deceased was in the act of drawing a firearm to kill or to attempt to do so, then defendant was not called on to retreat, but had the right to stand and defend himself even to taking the life of deceased, provided you do not further believe that defendant provoked the difficulty with the deceased with the apparent purpose to then and there take advantage thereof and kill deceased or do him serious bodily harm, and if you so believe you will acquit the defendant, for in that case he would be guilty of no degree of culpable homicide."

Now, will it be contended that the rule of law applicable to the question of provoking the difficulty or producing the occasion was not properly given in charge to the jury? We think not.

Counsel contend with great earnestness that there was error in regard to self-defense in another respect—that it was wrong to instruct as was done in the following charge:

"Homicide is justifiable in the protection of the person from any unlawful and violent attack, and in such case all other means must be

resorted to for the prevention of the injury, and the killing must take place while the person killed is in the act of making such unlawful and violent attack, or while the person killed is doing some hostile act or making some hostile demonstration that would, viewed from the standpoint of the slayer, produce in his mind a reasonable fear or expectation of death or some serious bodily injury.'

Was this law? Most certainly it was. The charge is in the language of the statute.. It is not objected that there were no facts requiring such a charge, but it is contended that it was wrong to require the accused to resort to all other means before taking life. If the facts of this case tend and tend only to show that deceased was about to kill appellant, then article 570 of the Penal Code should have been given in charge and the court should not have submitted to the jury the provisions of article 572.

Let us give to the testimony of the witness Garza all the strength to which it is justly entitled, and let us consider this testimony in the light of the threats made by deceased, and in the light of his violent character, does it tend to show an attempt on the part of deceased to murder appellant and nothing less? If so, the charge requiring the appellant to resort to all other means before killing was not called for and should not have been given.

But if the evidence of this witness did not tend to make a case in which deceased attempted to murder and nothing less, then the charge was called for and should have been given.

Looking, then, to his testimony, why should we infer that deceased attempted murder only? Why may we not infer that he intended to make some other violent attack beside an attempt to murder? What right or reason have we to presume conclusively that it was his purpose and intent to murder appellant and not to inflict a lesser degree of violence upon him? Under communicated threats, will every movement, demonstration, or gesture made by the deceased warrant only the inference that he intended to kill? Certainly not.

If a homicide is committed for the purpose of preventing murder, the person killing is not required to resort to other means to prevent the murder or an apparent attempt to commit murder. Art. 570. But if to prevent any unlawful and violent attack beside murder and those mentioned in article 570, then all other means must be resorted to for the prevention of the injury. Art. 572. These are plain provisions of the code, and must be enforced by the courts.

The next question is, What degree of violence, or what must be the quality of the unlawful and violent attack mentioned in article 572 to justify the homicide—not reduce, but justify? This is answered by article 574: "It must be such as produces a reasonable expectation or fear of death or some serious bodily injury."

If these last propositions are not correct, then there is no place for manslaughter under the provisions of the first subdivision of article 597, Penal Code.

Let us illustrate: A strikes B—fells him to the earth; the blow produces pain and bloodshed. B rises, draws his weapon, and while A is repeating his blow B kills him. Now, if the attack is such as to produce a reasonable expectation of death or some serious bodily injury in the mind of B, he would be justifiable; but if the attack was not calculated to, nor did not have such effect, he would be guilty of manslaughter.

A makes an unlawful and violent attack upon B—not such, however, as to produce in the mind of B a reasonable expectation or fear of death or some serious bodily injury. B kills A while in the very act of making such attack after resorting to all other means to prevent the injury. Would B be justified or would he be guilty of manslaughter? Who would contend that B would be justified?

The judge who tried this case submitted to the jury the rules of law contained in articles 570, 572, 573, and 574, and also the rules relating to justifiable homicide under threats. These rules of law we think were correctly given, and when the charge in this connection is considered as a whole, it will we think be found to contain the law applicable to the case and every phase of the case.

We have considered the case very closely, and while we have the highest opinion of the learning and ability of the counsel for appellant we must adhere to our first view of this case. We do not believe the record contains a reversible error, and the motion for rehearing must be denied.

*Motion denied.*

Davidson, J., being disqualified, did not sit in the case.